JAMES A. PATTEN
PATTEN, PETERMAN,
BEKKEDAHL & GREEN,
      PLLC
Suite 300, The Fratt Building
2817 Second Avenue North
Billings, MT 59101-2041
Telephone:  (406) 252-8500
Facsimile:  (406) 294-9500
email:  apatten@ppbglaw.com

STEPHAN C. VOLKER (*Pro hac vice pending*)
ALEXIS E. KRIEG (*Pro hac vice pending*)
STEPHANIE L. CLARKE (*Pro hac vice pending*)
JAMEY M.B. VOLKER (*Pro hac vice pending*)
LAW OFFICES OF STEPHAN C. VOLKER
1633 University Avenue
Berkeley, California 94703-1424
Telephone:  (510) 496-0600
Facsimile:  (510) 845-1255
email:      svolker@volkerlaw.com
            akrieg@volkerlaw.com
            sclarke@volkerlaw.com
            jvolker@volkerlaw.com

Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
GREAT FALLS DIVISION

| | |
|---|---|
| INDIGENOUS ENVIRONMENTAL NETWORK and NORTH COAST RIVERS ALLIANCE,<br><br>　　　　　　　Plaintiffs,<br>　vs.<br><br><br>UNITED STATES BUREAU OF LAND MANAGEMENT; DAVID BERNHARDT, in his official capacity as U.S. Secretary of the Interior; JOHN MEHLHOFF, in his official capacity as Montana/Dakotas State Director for the Bureau of Land | Civ. No.<br><br>**COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF** |

Management; UNITED STATES ARMY
CORPS OF ENGINEERS; LT. GENERAL
TODD T. SEMONITE, Commanding
General and Chief of Engineers; UNITED
STATES DEPARTMENT OF STATE;
MICHAEL R. POMPEO, in his official
capacity as U.S. Secretary of State;
UNITED STATES FISH AND WILDLIFE
SERVICE, a federal agency; AURELIA
SKIPWITH, in her official capacity as
Director of the U.S. Fish and Wildlife
Service; and DONALD J. TRUMP, in his
official capacity as PRESIDENT OF THE
UNITED STATES,

Defendants

Plaintiffs Indigenous Environmental Network ("IEN") and North Coast
Rivers Alliance ("NCRA") bring this action to challenge, in chronological order:

(1) Defendant UNITED STATES ARMY CORPS OF ENGINEERS' ("the
CORPS'") adoption of a final Decision Document and Finding of No Significant
Impact ("FONSI") on January 6, 2017 approving reissuance of Nationwide Permit
("NWP") 12 under section 404(e) of the Clean Water Act (33 U.S.C. section 1251
et seq. ("CWA")), 33 U.S.C. section 1344(e), and allowing the Keystone XL
Pipeline Project ("Keystone" or "Project") proposed by TRANSCANADA
KEYSTONE PIPELINE LP and TC ENERGY CORPORATION (collectively,
"TRANSCANADA"), in violation of the National Environmental Policy Act, 42
U.S.C. section 4321 et seq. ("NEPA") – alleged in the First (NEPA) Claim for

Relief;

(2) Defendant PRESIDENT DONALD J. TRUMP's  ("PRESIDENT TRUMP's") claim that issuance on April 10, 2019 of his Executive Order 13,867 retroactively saved his March 29, 2019 Presidential Permit ("2019 Permit") from invalidation due to its conflict with Executive Order 13,337 – alleged in the Fifth (Declaratory Judgment) Claim for Relief.

(3) Defendant UNITED STATES DEPARTMENT OF STATE's ("STATE's") issuance on December 20, 2019 of a deficient Final Supplemental Environmental Impact Statement ("2019 FSEIS") for Keystone in violation of NEPA – alleged in the First (NEPA) Claim for Relief;

(4) Defendant UNITED STATES FISH AND WILDLIFE SERVICE's ("FWS's") decision on December 23, 2019 to rely upon an inadequate Biological Assessment ("BA") rather than to prepare a Biological Opinion ("BiOp") as required to analyze the Project's impacts on endangered and threatened species (other than the American burying beetle) in violation of the Endangered Species Act, 16 U.S.C. section 1531 et seq. ("ESA") and the Administrative Procedure Act, 5 U.S.C. sections 701-707 ("APA") – alleged in the Fourth (ESA and APA) Claim for Relief; and

(5) Defendant UNITED STATES BUREAU OF LAND MANAGEMENT's ("BLM's") issuance on January 22, 2020 of a Record of Decision ("ROD") approving a right-of-way ("ROW") and temporary use permit ("TUP") allowing construction and operation of the Project, based on State's deficient 2019 FSEIS,

in violation of NEPA, the Mineral Leasing Act, 30 U.S.C. section 181 et seq.

("MLA") and the Federal Land Policy Management Act, 43 U.S.C. section 1701 et

seq.  ("FLPMA") – alleged in the First (NEPA), Second (MLA) and Third

(FLPMA) Claims for Relief, respectively.

## INTRODUCTION

1.       Keystone is a proposed 1,209-mile long, 36-inch diameter crude oil

pipeline that would be constructed within a 110-foot wide construction right-of-

way across 327 miles in the Canadian provinces of Alberta and Saskatchewan and

882 miles in the states of Montana, South Dakota and Nebraska to transport up to

830,000 barrels per day of tar sands crude oil from Hardisty, Alberta and the

Bakken shale formation in Montana to existing pipeline facilities near Steele City,

Nebraska.  U.S. Department of State, Final Supplemental Environmental Impact

Statement for the Keystone XL Project (December 2019) ("2019 FSEIS") at S-1;

84 Fed.Reg. 13101-13103 (Apr. 3, 2019).  The Project would pose grave risks to

the environment, including the climate, cultural resources, water resources, fish

and wildlife, and human health and safety.

2.       State's issuance of the 2019 FSEIS on December 20, 2019, FWS's

reliance on BLM's inadequate BA rather than preparing the required BiOp on

December 23, 2019, and BLM's issuance of a ROD granting rights-of-way and

temporary use permits on January 22, 2020, are the latest in a series of unlawful

actions by the Administration of President Donald J. Trump to implement his

unlawful 2019 Permit.  Plaintiffs challenged that permit in a separate action filed

April 5, 2019, *Indigenous Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.)), which remains pending.

3.    Notwithstanding a thoroughly-documented determination on November 6, 2015 by former Secretary of State John Kerry that the Keystone Pipeline Project was not in the national interest, shortly after his inauguration in early 2017, President Trump requested TransCanada's reapplication for a Presidential Permit, which President Trump approved just two months later despite the fact that State's underlying Final Supplemental Environmental Impact Statement ("FSEIS") was unlawfully inadequate in several notable respects. *Indigenous Environmental Network v. United States Department of State*, 347 F.Supp.3d 561, 591 (D. Mont. Nov. 8, 2018) (ordering that the 2017 Permit be "VACATED" due to deficiencies in the 2014 FSEIS); 82 Fed.Reg. 16467 (April 4, 2017).

4.    When this Court ruled the 2014 FSEIS invalid in August, 2018, because it failed to address the Project's new alignment through Nebraska, and again in November, 2018, because it ignored or understated several of the Project's significant impacts, President Trump refused to comply with this Court's Judgment.  Instead, President Trump actively sought to sidestep – and unlawfully to alter – the law to fit his agenda.  On March 29, 2019, he unilaterally and unconstitutionally approved a new Presidential Permit ("2019 Permit") for the Project (84 Fed.Reg. 13101-13103 (Mar. 29, 2019)), which, as noted, Plaintiffs have challenged in separate litigation.  *Indigenous Environmental Network v.*

*Trump*, Case No. 19-cv-0028-GF-BMM (D.Mont.).  He then attempted to
retroactively legalize his 2019 Permit by revoking the Executive Order it directly
violated – Executive Order 13,337 – through issuance of Executive Order 13,867
on April 10, 2019 – twelve days *after* his unlawful issuance of the 2019 Permit on
March 29, 2019.

     5.     Despite this Project's continuing illegality and profound
environmental impacts, particularly its exacerbation of the global warming crisis,
Defendants are still attempting to resurrect and construct Keystone.

     6.     In furtherance of this ill-conceived Project, BLM's ROD grants a
right-of-way ("ROW") and temporary use permit ("TUP") pursuant to the MLA.
The ROW and TUP allow the Project to cross 46.28 miles of federal land in
Montana – 44.4 miles managed by BLM, and 1.88 miles managed by the Corps.
2019 FSEIS at S-7, 1.3.4.  However, that ROD relies upon a deficient FSEIS, in
violation of NEPA, and its approvals of the ROW and TUP for Keystone
contravene bedrock environmental protections embodied in FLPMA, the MLA
and the ESA.

     7.     Defendant State issued the 2019 FSEIS, and published notice of its
availability for public review through January 21, 2020 in the Federal Register, on
December 20, 2019.  84 Fed.Reg. 70187-70188 (Dec. 20, 2019).  One month later,
when BLM published in the Federal Register notice of its ROD approving the
ROW and TUP for Keystone, its notice acknowledged  that "[t]he State

Department has been the Lead Federal Agency for purposes of NEPA, and BLM and USACE have been Cooperating Agencies from the beginning of this project." 85 Fed.Reg. 5232 (January 29, 2020).  As Lead Federal Agency under NEPA, State has "primary responsibility" for the content of the FSEIS and its failure to comply with NEPA's requirements.  40 C.F.R. § 1508.16 ("'Lead agency' means the agency or agencies preparing or having taken primary responsibility for preparing the environmental impact statement.").  The 2019 FSEIS, like the deficient 2014 FSEIS before it, fails to take a hard look at the impacts of Keystone.  BLM's approval of the ROD based on this inadequate 2019 FSEIS violates NEPA.

8.     BLM's ROD likewise violates the MLA.  The MLA mandates that grants of rights-of-way and associated temporary permits must comply with applicable federal environmental laws, including NEPA, and be based on regulations or stipulations "designed to control or prevent [] damage to the environment" including "damage to fish and wildlife habitat" and "hazards to public health and safety," and "protect . . . individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife and biotic resources of the area for subsistence purposes."  30 U.S.C. §§ 185(h)(1), 185(h)(2).  Because the ROD relies on the 2019 FSEIS which fails to adequately analyze the Project's environmental impacts as detailed below, and because, as a consequence of this deficient NEPA review, the ROW and TUP are not adequately designed to control or prevent damage to the environment including fish and wildlife, and to the

- 7 -

Indigenous communities who rely on the fish, wildlife and biotic resources of the impacted areas for subsistence purposes, the ROD violates both NEPA and the MLA.

9.     The ROD also violates FLPMA's mandate that BLM must limit to the extent feasible the natural resource damage that the Project would cause along its right-of-way.  43 U.S.C. § 1765.  Because the 2019 FSEIS fails to adequately analyze the Project's environmental impacts as detailed below, and as a consequence BLM failed to adequately explore, evaluate and adopt terms and conditions that would avoid or reduce the Project's foreseeable environmental impacts, Keystone will cause unnecessary and undue degradation to the environment and thus BLM's ROD violates FLPMA.

10.     FWS violated the ESA when it issued its December 23, 2019 concurrence letter based solely on, and without independently evaluating, BLM's inadequate 2019 Biological Assessment on Keystone.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a), (b)(1).  The record before FWS demonstrated that the Project might affect listed species or their critical habitat and that there had been no consultation as to those impacts.  Consequently, FWS had a duty under the ESA to prepare a Biological Opinion to evaluate Keystone's impacts on threatened and endangered species and their critical habitat, but failed to do so.  *Id*.  FWS also failed, in preparing its deficient concurrence letter, to rely on the best available scientific data as required by the ESA.  16 U.S.C. § 1536(a)(2), (b), (c).

- 8 -

11.     The Corps violated NEPA when it issued its Decision Document and FONSI on January 6, 2017, approving a revised NWP 12 under section 404(e) of the CWA, 33 U.S.C. section 1344(e).  The Corps' approval of NWP 12 allowed the Project's discharge of dredged or fill materials into waters of the United States, as that permit's scope includes any "pipeline for the transportation of any . . . liquid . . . substance" such as crude oil.  82 Fed.Reg. 1860, 1985, 1999-2000 (January 6, 2017).  The Corps purported to find that NWP 12 would result in "no more than minimal individual and cumulative adverse effects on the aquatic environment" under the CWA.  In fact, NWP 12 posed potentially significant impacts on the aquatic environment, and therefore under NEPA, the Corps had a duty to either prepare, or receive from another federal agency, an adequate environmental impact statement addressing those impacts.

12.     By accepting the Corps' erroneous conclusion that the Project's NWP 12 does not affect listed species or critical habitat, the FWS likewise failed to perform its duty to adequately consult with the Corps under the ESA and the APA.

13.     To remedy these violations of law, Plaintiffs seek orders from this Court:  (1) declaring that (a) Defendants violated NEPA, the MLA, FLPMA, the ESA, and the APA, and (b) President Trump's issuance of Executive Order 13,867 did not retroactively excuse the 2019 Permit's violation of Executive Order 13,337; (2) granting preliminary injunctive relief restraining Defendants, including TransCanada should it intervene, from taking any action that would result in any change to the physical environment in connection with Keystone pending a full

hearing on the merits; and (3) granting permanent injunctive relief overturning Defendants' aforementioned approvals of Keystone pending their compliance with applicable law including NEPA, the MLA, FLPMA, the ESA and the APA.

## JURISDICTION AND VENUE

14.    The Court has jurisdiction over this action under 28 U.S.C. sections 1331 (federal question), 1346 (U.S. as defendant), 1361 (mandamus against an officer of the U.S.), 2201 (declaratory judgment), and 2202 (injunctive relief); under the APA, 5 U.S.C. section 706(1) and (2) (to compel agency action unlawfully withheld or delayed, and to hold unlawful and set aside agency action found to be arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law, contrary to constitutional right or power, in excess of jurisdiction, or without observance of procedure required by law); and under the ESA, 16 U.S.C. sections 1540(g)(1)(A) and (C) (based on notice given in 2017 and to be renewed as necessary, to the extent, if any, jurisdiction does not exist under the APA per *American Rivers v. National Marine Fisheries Service* ("*American Rivers*"), 126 F.3d 1118, 1124-1125 (9th Cir. 1997)) because:

(1) the action arises under NEPA, the MLA, FLPMA, and the ESA and challenges final agency action reviewable under the APA per *American Rivers*, 126 F.3d at 1124-1125;

(2) State, BLM, the Corps, and FWS are agencies of the U.S. government, and the individual Defendants are sued in their official capacities as officers of the

U.S. government;

(3) the action seeks a declaratory judgment (a) declaring void the Corps'
January 6, 2017 NWP 12, State's December 20, 2019 FSEIS, FWS' December 23,
2019 acceptance of a deficient Biological Assessment and decision not to prepare
a Biological Opinion, and BLM's January 22, 2020 ROD approving the ROW and
TUP that allow Keystone's construction and operation, and (b) declaring that
President Trump's issuance of Executive Order 13,867 on April 10, 2019 did not
retroactively validate the 2019 Permit; and

(4) the action seeks further injunctive and mandamus relief until the
Defendants comply with applicable law.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. section
1391(e)(1)(B) and Montana Local Civil Rules 1.2(c)(3) and 3.2(b)(1)(A) because a
substantial part of the events giving rise to this action – namely, construction and
operation of the proposed pipeline Project – would cross the international border
in, and thence pass through, Phillips County, Montana, which is located within the
Great Falls Division of this judicial district.  28 U.S.C. § 1391(e)(1)(B); Mont.
Civ.R. 3.2(b)(1)(A).

16.     There exists now between the parties hereto an actual, justiciable
controversy in which Plaintiffs are entitled to have a declaration of their rights, a
declaration of Defendants' obligations, and further relief because of the facts and
circumstances herein set forth.

17.     This Complaint is timely filed within the applicable six-year statute of limitations set forth in 28 U.S.C. section 2401(a).

18.     Plaintiffs have standing to assert their claims and, to the extent required, have exhausted all applicable remedies.  In particular, Plaintiffs' members live, work, recreate in or otherwise use and enjoy the lands, waters and plant and animal species and their habitat through which Keystone would pass or otherwise impact, including the federal lands and waters it would cross.

**PARTIES**

19.     Plaintiff INDIGENOUS ENVIRONMENTAL NETWORK ("IEN") is incorporated under the non-profit organizational name of Indigenous Educational Network of Turtle Island.  Established in 1990, IEN is a network of Indigenous peoples from throughout North America including the states of Montana, South Dakota and Nebraska and the Province of Alberta through which the Project is proposed to be built, who are empowering their Indigenous Nations and communities toward ecologically sustainable livelihoods, long-denied environmental justice, and full restoration and protection of the Sacred Fire of their traditions.  Its members include chiefs, leaders and members of Indigenous Nations and communities who inhabit the states and provinces through which the Project is proposed to be built and who would be directly and irreparably harmed by its many severe adverse environmental and cultural impacts.  IEN has been involved in grassroots efforts throughout the United States and Canada to mobilize

and educate the public regarding the harmful environmental and cultural impacts
of the Project.  IEN's members include individuals who have hiked, fished,
hunted, observed and photographed wildlife and wild flowers, star-gazed, rode
their horses, floated, swum, camped and worshipped the Creator on lands and
waters within and adjacent to the proposed route of the Project and who intend to
continue to do so in the future.  Because IEN's members use and enjoy the land
and water resources and wildlife within the Project area that the Project would
harm, they would be directly and irreparably harmed by the construction and
operation of the Project and by the Project's oil spills that would pollute the lands
and waters that IEN's members use and enjoy.

20.    Plaintiff NORTH COAST RIVERS ALLIANCE ("NCRA") is an
unincorporated association of conservation leaders from the western and northern
United States and Canada.  NCRA has participated in public education, advocacy
before legislative and administrative tribunals, and litigation in state and federal
court to enforce compliance by state and federal agencies with state and federal
environmental laws.  NCRA's members include individuals who have camped,
fished, observed and photographed wildlife and wildflowers, star-gazed, rode their
horses, drove their wagon teams, floated, hiked and worshipped the Creator on
lands and waters within and adjacent to the proposed route of the Project and who
intend to continue to do so in the future.  Because NCRA's members use and enjoy
the land and water resources and wildlife within the Project area that the Project
would harm, they would be directly and irreparably harmed by the construction

and operation of the Project and by the Project's oil spills that would pollute the lands and waters that NCRA's members use and enjoy.

21.      Plaintiffs' injuries are fairly traceable to Defendants' actions. Construction and operation of the Project, including the 46.28 miles on federal land in Montana, will harm Plaintiffs' use of the Project area including ground and surface waters the Project would cross, for fishing, hunting, camping and other recreational purposes, and domestic, cultural and spiritual activities including nature study, wildlife and wildflower viewing, scenic enjoyment, photography, hiking, family outings, star gazing and meditation.  These injuries are actual, concrete, and imminent.  Plaintiffs have no plain, speedy, or adequate remedy at law.  Accordingly, Plaintiffs seek injunctive, mandamus, and declaratory relief from this Court to set aside Defendants' unlawful acts and omissions, and to redress Plaintiffs' injuries.

22.      Defendant UNITED STATES BUREAU OF LAND MANAGEMENT ("BLM") is an agency within the U.S. Department of the Interior.  Under FLPMA, BLM is charged with administering lands owned by the United States and assigned to its management, including lands within the proposed route of the Project, consistent with federal environmental laws including NEPA, the MLA, the ESA, and the APA.  43 U.S.C. § 1701 et seq.  On January 22, 2020, BLM issued the ROD that authorizes the ROW and TUP for Keystone that this action challenges.

23.     Defendant DAVID BERNHARDT is the Secretary of the U.S. Department of the Interior and is sued in his official capacity.  He is the federal official charged with responsibility for the proper management of BLM and FWS in compliance with applicable law, and is responsible for the actions or failure to act of those agencies regarding the Project challenged herein.  He is the official who signed the ROD authorizing the ROW and TUP for Keystone that this action challenges.

24.     Defendant JOHN MEHLHOFF is the State Director for the Montana/Dakotas State Office of BLM.  He is the official who recommended approval of the ROD authorizing the ROW and TUP for Keystone that this action challenges.

25.     Defendant UNITED STATES ARMY CORPS OF ENGINEERS ("the Corps") is an agency of the federal government.  The Corps is charged with management of waters of the United States, including compliance with the Clean Water Act and related statutes intended to protect those waters from environmental harm.  The Corps has specific responsibility over issuance of both individual and nationwide permits for the discharge of dredged or fill materials into navigable waters of the United States under section 404 of the Clean Water Act.  33 U.S.C. § 1344.  On January 6, 2017 the Corps approved renewal of Nationwide Permit 12 ("NWP 12") on which Defendants rely to construct crossings for Keystone over and under waters of the United States under section 404(e) of the Clean Water Act, 33 U.S.C. section 1344(e).  The Corps also

- 15 -

manages 1.88 miles of the ROW for Keystone whose approval this action challenges.

26.     Defendant LT. GENERAL TODD T. SEMONITE is Chief of Engineers and Commanding General of the Corps, and is sued herein in his official capacity.  He is charged with the supervision and management of all decisions and actions by the Corps, including those allowing construction of Keystone that this action challenges.

27.     Defendant UNITED STATES DEPARTMENT OF STATE ("Department of State" or  "State") is an agency of the United States government charged with review and approval of permits for pipelines that cross the United States' borders with other countries, including Canada.  Executive Order 13,337; see also, Executive Order 13,867 (purportedly revoking Executive Order 13,337). Under NEPA, the Department of State was responsible for preparing the 2019 FSEIS on which BLM's ROD relies in authorizing the ROW and TUP for Keystone that this action challenges.  22 C.F.R. §§ 161.7, 161.7(c)(1) (acknowledging State's NEPA obligations when reviewing trans-boundary pipeline permits); 85 Fed.Reg. 5232 (acknowledging that "[t]he State Department has been the Lead Federal Agency for the purposes of NEPA" for the United States' review of Keystone); 40 C.F.R. § 1508.16 (defining "lead agency").

28.     Defendant MICHAEL R. POMPEO is the U.S. Secretary of State, and is sued herein in his official capacity.  He is the official charged with

administering the Department of State, including carrying out and complying with NEPA, and is responsible for the deficiencies in the 2019 FSEIS that this action challenges.

29.     Defendant UNITED STATES FISH AND WILDLIFE SERVICE ("FWS") is an agency within the U.S. Department of the Interior.  Under the ESA, FWS is charged with the preservation of endangered and threatened species and their habitat, including the species that the Project will harm.  FWS violated the ESA when it issued its December 23, 2019 concurrence letter based on, and without independently evaluating, BLM's inadequate 2019 Biological Assessment on Keystone, and by failing to prepare the Biological Opinion it was required to prepare to evaluate Keystone's impacts on threatened and endangered species. FWS therefore failed to conduct the formal consultation with BLM required by the ESA, and in doing so, failed to rely on the best available scientific data as required by the ESA.  Each of these unlawful actions was a "final agency action" reviewable under the APA.

30.     Defendant AURELIA SKIPWITH is the Director of FWS, and is sued herein in her official capacity.  She is charged with responsibility for carrying out and complying with the ESA, and with preserving endangered and threatened species and their habitat that Keystone will harm.  She failed to discharge her duties under the ESA by allowing Keystone to be approved without compliance with the ESA.

31.    Defendant DONALD J. TRUMP ("President Trump") is the President of the United States, and is sued in his official capacity.  On March 29, 2019 he issued the Presidential Permit whose implementation this action challenges.  His 2019 Permit was published on April 3, 2019 in the Federal Register.  84 Fed.Reg. 13101-13103.  On April 10, 2019, President Trump issued Executive Order 13,867 as to which this action seeks declaratory relief.  Executive Order 13,867 was published on April 15, 2019 in the Federal Register.  84 Fed.Reg. 15491-15493.

## BACKGROUND

32.    In September 2008, TransCanada filed with State an initial application for a Presidential Permit to construct and operate Keystone.  The original application was amended and resubmitted on May 4, 2012 to modify the description of the Project's route through Nebraska, and to remove the original Project's southern segment from Cushing, Oklahoma to the Gulf of Mexico.  The amended application requested approval of a Presidential Permit for a proposed crude oil pipeline widely known as the Keystone XL Pipeline that would run approximately 875 miles from the Canadian border in Phillips County, Montana to connect to an oil pipeline in Steele City, Nebraska.

33.    On March 1, 2013, State released a Draft Supplemental Environmental Impact Statement ("2013 DSEIS") for the new Presidential Permit application for the proposed Keystone XL Pipeline Project.

34.    On March 8, 2013, the U.S. Environmental Protection Agency

("EPA") announced the availability of the 2013 DSEIS on its website, starting the 45-day public comment period.

35.     On April 18, 2013, State held a public meeting in Grand Island, Nebraska, and on April 22, 2013, the comment period on the 2013 DSEIS closed.

36.     On May 15, 2013, FWS transmitted its Biological Opinion for the proposed Keystone XL Pipeline Project to State.

37.     State provided an additional 30-day opportunity for the public to comment during the National Interest Determination comment period that began with the February 5, 2014 notice in the Federal Register announcing the release of the Final SEIS ("2014 FSEIS").

38.     On November 6, 2015, Secretary of State John Kerry determined, pursuant to Executive Order 13,337, that issuing a Presidential Permit for the proposed Keystone XL Pipeline's border facilities would not serve the national interest, and denied the permit application.

39.     On January 6, 2017, the Corps adopted its final Decision Document and FONSI approving reissuance of NWP 12 under section 404(e) of the CWA, 33 U.S.C. section 1344(e).  NWP 12 allowed discharges of dredged and fill materials that could cause significant impacts to the aquatic environment from oil pipeline projects such as Keystone.  The Corps purported to find that NWP 12 would result in "no more than minimal individual and cumulative adverse effects on the aquatic environment" under the CWA, and therefore issued a FONSI declaring that its

approval would have no potential for significant impacts on the environment.  In fact, NWP 12 and the projects it enabled do pose such impacts.

40.    On January 20, 2017, Donald J. Trump was inaugurated as the 45th President of the United States.  Four days later, on January 24, 2017, President Trump issued a Presidential Memorandum Regarding Construction of the Keystone XL Pipeline which, *inter alia*, invited the permit applicant "to resubmit its application to the Department of State for a Presidential permit for the construction and operation of the Keystone XL Pipeline."

41.    On January 24, 2017, President Trump also issued an Executive Order on Expediting Environmental Reviews and Approvals for High Priority Infrastructure Projects in which he set forth the general policy of the Executive Branch "to streamline and expedite, in a manner consistent with law, environmental reviews and approvals for all infrastructure projects, especially projects that are a high priority for the Nation," and cited pipelines as an example of such high priority projects.  *Id.*

42.    On January 26, 2017, State received a re-submitted application from TransCanada for the proposed Project.  The re-submitted application included purportedly minor route alterations reflecting agreements with local property owners for specific rights-of-way and easement access, ostensibly within the areas previously included by State in its 2014 FSEIS.

43.    Less than two months later, and without providing for public and

agency review of TransCanada's January 26, 2017 application, on March 23, 2017, State granted a Presidential Permit to TransCanada, allowing its construction and operation of Keystone.

44.     On March 27, 2017, Plaintiffs filed suit challenging State's Record of Decision and National Interest Determination, and its Presidential Permit, allowing TransCanada to construct and operate the Project, as well as the Department of State's 2014 FSEIS for the Project.  A second suit challenging those approvals was filed on March 30, 2017, and on October 4, 2017, both actions were consolidated for briefing and hearing.

45.     On November 22, 2017, the Court denied motions to dismiss filed by TransCanada and State that claimed that Plaintiffs had challenged a Presidential action that was not reviewable under the APA.

46.     On August 15, 2018, the Court granted partial summary judgment to Plaintiffs, and ordered State to supplement its NEPA review to analyze the Project's revised "Main Line Alternative" Route, or "MAR," through Nebraska. *Indigenous Environmental Network v. United States Department of State*, 317 F.Supp.3d 1118, 1123 (D. Mont. 2018).

47.     On November 8, 2018, the Court decided the remaining claims, ruling for Plaintiffs on some and vacating State's Record of Decision and National Interest Determination.  *Indigenous Environmental Network v. United States Department of State*, 347 F.Supp.3d 561, 591 (D. Mont. 2018).

48.    The Court permanently enjoined State and TransCanada "from engaging in any activity in furtherance of the construction or operation of Keystone [XL] and associated facilities" until specified supplemental reviews are completed and State renders a new Record of Decision and National Interest Determination.  *Id.*

49.    After further briefing, the Court clarified and supplemented its Order on December 7, 2018 and February 15, 2019.  *Indigenous Environmental Network v. United States Department of State*, 369 F.Supp.3d 1045 (D. Mont. 2018); *Indigenous Environmental Network v. United States Department of State*, 2019 WL 652416 (D. Mont. 2019).  The Court allowed TransCanada to construct and use pipeline storage yards outside of the Project's right-of-way, but otherwise denied its Motion for Stay.

50.    On February 21, 2019, TransCanada filed in the Ninth Circuit Court of Appeals a Motion for Stay Pending Appeal of the Court's orders filed November 8, 2018, December 7, 2018, and February 15, 2019, vacating Defendants' approvals, and enjoining TransCanada's construction, of the Project. On March 15, 2019, the Ninth Circuit Court of Appeals denied TransCanada's Motion, concluding that "TransCanada has not made the requisite strong showing that they are likely to prevail on the merits."  *Indigenous Environmental Network v. United States Department of State*, Case No. 18-36068, Order (9th Cir., Mar. 15, 2019).

- 22 -

51.     After losing on the merits and failing to secure a stay of the Court's injunction, President Trump chose to evade the effect of those court orders. Rather than comply with applicable federal environmental laws as directed by these courts pursuant to their authority to interpret and apply the law under Article III of the United States Constitution, on March 29, 2019 President Trump attempted to sidestep those rulings by issuing, through his Office of the Press Secretary, a new "Presidential Permit" purportedly "grant[ing] permission" for TransCanada "to construct, connect, operate and maintain" Keystone *without compliance with these court rulings.* President Trump, however, is not above the law. Accordingly, Plaintiffs challenged that permit in a separate action filed April 5, 2019, *Indigenous Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.), which remains pending.

52.     On October 4, 2019, State published notice in the Federal Register that its Draft Supplemental Environmental Impact Statement ("2019 DSEIS") was available for public review and comment. 84 Fed.Reg. 53215-53217 (Oct. 4, 2019).

53.     On November 18, 2019, Plaintiffs submitted timely comments on the 2019 DSEIS to State via Regulations.gov, and U.S. Mail.

54.     On December 20, 2019, State published notice in the Federal Register that its 2019 FSEIS was available. 84 Fed.Reg. 70187-70188 (Dec. 20, 2019). The 2019 FSEIS, however, like the deficient 2014 FSEIS that preceded it, fails to

take a hard look at the impacts of Keystone, and therefore violates NEPA.

55.    On December 23, 2019, FWS issued a concurrence letter to BLM, concluding that Keystone is not likely to adversely affect listed species, with the exception of the American burying beetle.  FWS prepared a Biological Opinion addressing Keystone's impacts on the American burying beetle, but uncritically accepted and relied upon the deficient analysis and conclusions in BLM's 2019 Biological Assessment in deciding not to prepare a Biological Opinion that would fully analyze the Project's adverse effects on other listed species such as the pallid sturgeon.

56.    On January 22, 2020, Defendant BLM, in reliance upon State's insufficient 2019 FSEIS, issued its ROD granting to TransCanada the ROW and TUP that it required under the MLA and FLPMA to construct Keystone.  The ROW and TUP allow the Project to cross 46.28 miles of federal land in Montana – 44.4 miles managed by BLM, and 1.88 miles managed by the Corps of Engineers. BLM published notice of its approvals in the Federal Register on January 29, 2020.  85 Fed.Reg. 5232-5233 (Jan. 29, 2020).

57.    Defendants' approvals of the January 2017 NWP, December 2019 FSEIS, December 2019 concurrence letter accepting an inadequate Biological Assessment, and January 2020 ROD approving the ROW and TUP, violate NEPA, the MLA, FLPMA, the ESA and the APA as alleged more specifically below.

//

- 24 -

## FIRST CLAIM FOR RELIEF

## (Violation of the National Environmental Policy Act)

## (Against All Defendants)

58.     The paragraphs set forth above and below are realleged and incorporated herein by reference.

59.     By (1) reissuing NWP 12 under section 404 of the CWA based on a FONSI declaring incorrectly that Keystone posed no significant impacts on the environment on January 6, 2017, (2) issuing a deficient FSEIS for Keystone on December 20, 2019, and (3) approving the ROD for Keystone on January 22, 2020 based on that inadequate 2019 FSEIS, the Corps, State and BLM, respectively, violated NEPA, 42 U.S.C. section 4321 *et seq*., and its implementing regulations, 40 C.F.R. section 1500 *et seq*.  The Corps, State and BLM thereby failed to proceed in accordance with law in violation of the APA, 5 U.S.C. section 706(2)(A) and (D).

## ENVIRONMENTAL IMPACTS

60.     An EIS must take a "hard look" at the environmental impacts of proposed major federal actions and provide a "full and fair discussion" of those impacts.  40 C.F.R. § 1502.1; *National Parks & Conservation Association v. Babbitt* ("*NPCA v. Babbitt*"), 241 F.3d 772, 733 (9th Cir. 2001).  Here, however, the 2019 FSEIS's required discussion of many environmental and cultural impacts

was never prepared, or is inadequate, as explained below.

*Cultural Resources*

61.     NEPA mandates that agencies analyze cultural resource impacts in environmental impact statements.  40 C.F.R. §§ 1502.16(g), 1508.8.  Defendants failed to complete cultural resource surveys for the Project prior to publication of the 2014 SEIS, or approval of the 2017 ROD.  Thus, "[t]he 2014 SEIS fail[ed] to provide a 'full and fair discussion of the potential effects of the project to cultural resources' in the absence of further information on the 1,038 unsurveyed acres." *IEN v. State*, 347 F.Supp.3d at 580, quoting *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 965 (9th Cir. 2005).

62.     Despite this Court's orders directing, and Plaintiffs' comments asking, Defendants to remedy their failure to complete essential surveys of threatened cultural resources as NEPA requires, the 2019 FSEIS does not correct this informational gap.  It fails to provide vital information essential for decision makers and the public to understand the Project's impacts on traditional cultural and historic resources in several respects.  First, at the time the 2019 FSEIS was published, Defendants had still failed to survey more than 500 acres of threatened cultural resources previously identified as requiring surveys.  2019 FSEIS 3.9-16.

63.     Second, the 2019 FSEIS fails to address the Project's impacts on recently discovered Indigenous cultural resources.  It reveals that for newly discovered traditional cultural sites along the Project's right-of-way in Montana,

"eligibility determinations and management recommendations have not been established at this time."  2019 FSEIS 4-70 to 4-71.  The 2019 FSEIS admits that although additional cultural resource evaluation and analysis are still required, they remain undone,  stating: "[a]s of the date of this document a report on the historic properties re-inspection is being prepared and will be sent to all applicable federal and state agencies and all tribal consulting parties for review and comment . . . ."  2019 FSEIS 3.9-16, 4-70 to 4-71.

64.    Because Defendants have failed to gather the foregoing essential information addressing the Project's impacts on cultural resources, they have failed to take the required hard look at the Project's impacts on the human environment as NEPA requires.  By approving the Project without first completing these additional, essential cultural resource surveys and analysis, and instead relying upon an admittedly deficient 2019 FSEIS, Defendants have failed to cure the deficiencies identified by the Court and Plaintiffs whose correction was and remains needed to comply with NEPA.

65.    Defendants' violations of their NEPA duties to identify and mitigate the Project's harm to cultural resources threaten profound harm to Indigenous communities including Plaintiffs' members.  The Keystone Pipeline is proposed to pass near "vulnerable unmarked graves of [Cheyenne River Sioux Tribe and Rosebud Sioux Tribe] ancestors and other cultural sites such as the camp of Chief Bigfoot before he led [their] people south, only to be massacred by the United States Army at Wounded Knee."  Declaration of Joye Braun in Support of

Plaintiffs' Motion for Preliminary Injunction filed July 10, 2019 in *Indigenous Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.) (Dkt. 27-4) ("Braun Dec.") at ¶ 8.

66.    Ms. Braun has attested to the significance of Defendants' failure to survey cultural resources as required by NEPA and how this omission threatens severe harm to these deeply sacred cultural resources:

> "Every year [the descendants of the survivors of this massacre] hold a horse ride with prayers along this route of sadness and tragedy.  For our people, this is a memorial horse ride to build strength, courage and fortitude among our youth.  It is done in quiet, respectful prayer.  After the ride is completed, descendants of the survivors of the massacre run back in the freezing cold to my homeland.  We fear what will happen to our unmarked graves and other cultural sites if the Keystone XL Pipeline is constructed and man-camps are installed as is now proposed within a few miles of the border of our Reservation."

*Id.* at ¶ 9.  Allowing Keystone to be built in a manner that literally tramples on and obliterates this irreplaceable cultural legacy would cause unimaginable pain and unconscionable humiliation to the Indigenous communities that still grieve for those lost to this genocide.

67.    Defendants' continuing failure to survey and protect cultural resources that are sacred to Indigenous communities is a daily reminder to them of

the centuries of discrimination and violence against their members they have

endured.  The tiny Indigenous community of Bridger, South Dakota, for example,

> "was founded by survivors of the Wounded Knee massacre perpetrated by
>
> the U.S. Army.  Because Bridger is a descendant community of survivors
>
> from that horrendous slaughter, the historical trauma remains prevalent in
>
> those who live here. . . . [T]he simple possibility of the Keystone XL
>
> pipeline [being constructed] has already significantly increased the stress
>
> level and anxiety in the Bridger Community."

Declaration of Elizabeth Lone Eagle filed July 10, 2019 in *Indigenous

Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.)

(Dkt. 27-15) ("Lone Eagle Dec.") at ¶ 9.

68.     Unless this Court orders Defendants to comply with NEPA by fully

and comprehensively identifying and mitigating the Project's potential adverse

impacts on the Indigenous communities' cultural and religious resources and

practices, including the sacred sites of birth rituals and death memorials, those

communities will suffer grievous harm.  Braun Dec. ¶¶ 8-9; Lone Eagle Dec. ¶ 9;

Declaration of Kandi White in Support of Plaintiffs' Motion for Preliminary

Injunction filed July 10, 2019 in *Indigenous Environmental Network v. Trump*,

Case No. 19-CV-0028-GF-BMM (D. Mont.)  (Dkt. 27-24) ("White Dec.") at ¶ 12.

69.     The construction and operation of the KXL Pipeline in proximity to

Native American reservations and rural settlements poses a direct threat to the

historic and cultural sites important to those communities.  The 2019 FSEIS'
failure to adequately address these impacts violates NEPA.

*Accidental Spills*

70.    The 2019 FSEIS fails to take a hard look at the Project's potential
impacts from oil spills in the following ways, among others.

71.    First, the 2019 FSEIS presents a distorted picture of the potential for
the Project's oil spills to impair waterways, groundwater, wetlands and soil,
downplaying the likelihood and severity of those spills.  It relies upon several
flawed assumptions in its discussion and modeling of oil spill impacts.

72.    The 2019 FSEIS reveals that a pinhole leak – a leak from a 1/32-inch
diameter hole – would allow up to 28 barrels of oil to spill each day from
Keystone's pressurized pipeline.  2019 FSEIS 5-17.  It admits that such a leak
"could continue unnoticed until the released volume is observed at the ground or
water surface or is identified during a pipeline integrity inspection."  2019 FSEIS
5-17.  But Keystone's automatic leak detection system would miss more that just
those pinhole leaks, as damaging as they would be by themselves, as discussed
below.

73.    The 2019 FSEIS reveals that TransCanada's automatic leak detection
systems are only able to sense leaks when they exceed approximately 1.5 to 2
percent of the pipeline's flow rate.  2019 FSEIS D-70; *see also* TransCanada's
January 17, 2020,  Keystone XL Pipeline Project Final Plan of Development

("POD") 139.[1]  The Project is designed "to transport up to 830,000 barrels per day (bpd)," which equates to 34,583 barrels per hour.  2019 FSEIS 1-8.  Thus, a spill of up to two percent of the flow of the pipeline, which can be expressed as approximately 692 barrels per hour or 16,600 barrels per day, would not be detected "in real time" by the automatic leak detection systems.  2019 FSEIS D-70; POD 139.  The 2019 FSEIS relies upon direct observations – although there is no provision for posting of trained observers – and non-real time, computer-based, pipeline volume "trend analysis" to detect these leaks.  *Id.*

74.     Neither proposal would work.  First, as the 2019 FSEIS concedes, visual observation would not detect leaks "until the spill volume is expressed on the surface."  2019 FSEIS D-70.  But the 2019 FSEIS assumes that leaking oil would be visible.  During the winter, ice forms on the surface, directly blocking detection of spills from surface observation.  Ice formation on the Missouri River below the Fort Peck Dam where Keystone would cross under the water begins in late November and lasts until late March or longer.  During this time snow accumulates on top of the ice.  Thus, for at least four months of the year, oil spills into the Missouri River would not be visible on the surface.  U.S. Army Corps of Engineers, Missouri River Mainstem Reservoir System Water Control Manual Volume 2, Fort Peck Dam – Fort Peck Lake (2018), III-11.  The initial ice formation usually begins 204 miles downstream at the headwaters of the Garrison

---

[1]   Defendant BLM's ROD incorporates and relies upon the POD as one basis for its approval of the Project.  ROD 5.

reservoir, and continues upstream – past the intake for the Assiniboine and Sioux Rural Water Supply System near Wolf Point, and then all the way to the reach immediately below Fort Peck Dam.  *Id.*, at VII-8.  During this approximately four-month period each year, it is unlikely that lower-volume oil spills in the river would be visible due to the iced-over condition.

75.    Second, the 2019 FSEIS provides no information on the amount of time required for a computer-based volume trend analysis to detect such leaks, leaving the public completely in the dark on this critical issue.  Worse, as noted, a leak of up to 16,600 barrels per day would not be detected "in real time" by the automatic leak detection systems.  2019 FSEIS D-70; POD 139.

76.    This omission cripples public evaluation of the magnitude of the oil spills that could occur before detection – let alone before the exact source is located and the leakage is halted.

77.    The inadequacy of this leak detection system became evident with the operation of TransCanada's original Keystone pipeline.  In May 2011, that Keystone pipeline spilled between 17,000 and 22,000 gallons of crude oil.  "That spill was discovered by a North Dakota rancher, Bob Banderet, on May 7, 2011, when he saw oil gushing from the Keystone Pipeline's Ludden pumping station near his land.  He reportedly called the emergency phone number that TransCanada Corporation (now TC Energy) had provided him as a volunteer firefighter to alert TransCanada's emergency response dispatcher to the spill."

- 32 -

White Dec. (Dkt. 27-24) at ¶ 6.  To cover up the fact that its detection system had failed, "TransCanada asked the Pipeline and Hazardous Materials Safety Administration to amend its shutdown order to state that TransCanada's internal sensors – rather than Mr. Banderet – had first discovered the leak.  TransCanada subsequently referred to this spill as proof that 'the system worked as it was designed to do.'"  *Id.*  But the leak detection system had, to the contrary, failed, even with this extremely large leak.  And TransCanada has not provided any reason why the same failure should not be expected here.

78.     The 2019 FSEIS's analysis of oil released in waterways is limited to "the distance the released crude oil might travel within 6 hours."  2019 FSEIS 5-3. This limitation is derived from the flawed assumption that TransCanada will prevent additional oil from spilling within six hours of when a spill starts.  *Id.*  The 2019 FSEIS states that "the 6-hour response time was used as it represents the maximum response time along the Missouri River stipulated by federal pipeline safety regulations."  2019 FSEIS D-60.  But these regulations merely require that TransCanada *begin to respond* within six hours "after *discovery* of a worst case discharge," not that the discovery – let alone the completed response – must occur within six hours of the leak.  49 C.F.R. § 194.115 (emphasis added).  As seen, TransCanada's discovery might be delayed for months.  And, of course, even after the leak is discovered, these regulations do not require that TransCanada complete its response within six hours of every spill's discovery.  *Id.*

79.     In sum, the 2019 FSEIS' entire analysis of Keystone's impacts due to

oil spills is a house of cards.  None of the premises on which it is based withstand scrutiny.  And for releases of less than 2 percent of the pipeline's flow rate, both in ice-covered waterways and those pooling under ground, the 2019 FSEIS's assumption that leaks will be contained within six hours is demonstrably unsupported, and unsupportable.  The 2019 FSEIS sweeps the real – and potentially severe – oil spill impacts of Keystone under the rug.

80.     While the 2019 FSEIS addresses additional action that would need to be taken when leaks under ice-covered waterways occur, this analysis assumes – again, incorrectly – that such leaks would be promptly detected in the first place. But as we have seen, if not visible from the surface, leaks would never be detected unless their volume excceds up to 2 percent of Keystone's entire flow.  As noted, the 2 percent threshold is a whopping 16,600 barrels of oil per day.  At 44 gallons per barrel, that totals 730,000 gallons per day.  The 2019 FSEIS' failure to account for lags in detection and response in its impact modeling and analysis misleads the public by ignoring significant oil spill impacts.  2019 FSEIS 5-38, D-63 to D-64. Defendants' failure to take a "hard look" at Keystone's impacts violates NEPA.

81.     In addition to unreasonably assuming rapid detection of spills, the 2019 FSEIS's impact modeling unreasonably assumes that oil spills in waterways will *always* be contained before oil can travel more than 40 river miles.  2019 FSEIS 5-2, D-58.  This is demonstrably unsupported and unsupportable.  As noted, during winter, leaking oil may flow hundreds of miles down river, hidden by ice and snow, before detection.  Tacitly conceding this fact, the 2019 FSEIS

states that even if the sheen and globules from an oil spill might travel beyond the 40-mile distance assumed in the impact analysis, this contamination would not pose a significant impact.  2019 FSEIS 5-2.  But instead of providing facts and analysis to support this claim, the FSEIS just assumes the impact would be insignificant because the quantity of contamination would be small compared to the river's total volume.  *Id*.  In other words, the 2019 FSEIS assumes that dilution is the solution to toxic pollution.  But modern science laid that notorious premise to rest decades ago.  Using it to dismiss an impact does not satisfy NEPA's unflinching demand for a fact-based "hard look."

82.    Attempting to pass off speculation as learned analysis, the 2019 FSEIS claims that oil globules "*typically* accumulate in depositional areas," and that they would do so here "at concentrations that would not *typically* result in significant impacts to aquatic biota."  2019 FSEIS 5-2 (emphasis added).  But the 2019 FSEIS makes no attempt to buttress this wishful thinking with actual facts and analysis, much less any assessment of the likelihood and effects of "atypical" impacts.

83.    The 2019 FSEIS likewise downplays the risk to groundwater resources, again relying upon an inapplicable model.  2019 FSEIS 5-37.  The "dissolved phase distance in groundwater" distances presented in the 2019 FSEIS are – not surprisingly – identical to the Hydrocarbon Spill Screening Model ("HSSM") output distances used in the discredited 2014 SEIS that this Court has already found inadequate.  2019 FSEIS 5-37; 2014 SEIS Appendix T at 5.  As

Plaintiffs demonstrated in the previous litigation, the HSSM model is not designed for use with pressurized oil pipelines like Keystone.  Therefore it has no application to this pipeline, let alone to prediction of groundwater plumes of pollution when it spills.

84.    Indeed, as Defendants have previously admitted, the HSSM "is intended to provide order of magnitude estimates of contamination levels only" and "not designed to address dynamic conditions."  2014 FSEIS PC-113 to PC-114.  The "dynamic conditions" for which "the model is not designed" include "fluctuating groundwater, changing gradient, or . . . *pressurized leaks* from a pipeline."  2014 FSEIS PC-134 (italics added).  As Plaintiffs explained in the previous litigation,  *all three* of these "dynamic conditions" would be present should the pipeline develop a leak in or over groundwater (whose level fluctuates), rivers or streams (whose gradient is necessarily "changing" since the water is flowing down gradient), and "pressurized leaks from a pipeline," which would always be the source of a leak from this pressurized pipeline.  Further, the HSSM is not designed to address dilbit, the heavy tar sands crude (mixed with a diluent) that Keystone would pump.  Rather, HSSM is used to evaluate "light non-aqueous phase liquid" – liquid that normally *floats* on water, rather than sinking as dilbit does.  2014 FSEIS PC-134.

85.    Defendant State was aware that these limitations render HSSM inapplicable and therefore unusable for estimating the Project's groundwater contamination plume, but utilized HSSM for the 2019 FSEIS anyway.  Instead of

discussing whether more accurate modeling is available as NEPA requires (per 40 C.F.R. § 1502.22), or addressing the defects in the existing modeling, Defendants deceptively removed any reference to HSSM from the 2019 FSEIS while continuing to rely upon its same, inapplicable, output data.  2019 FSEIS 5-37; 2014 FSEIS PC-134.  Thus, the 2019 FSEIS's analysis and conclusions regarding the Project's impacts to groundwater are as fundamentally and fatally flawed as were those of the 2014 SEIS that this Court has already ruled inadequate.

86.    The 2019 FSEIS' analysis of oil spill impacts to wetlands likewise fails to satisfy NEPA's "hard look" requirement.  40 C.F.R. § 1502.1; *NPCA v. Babbitt*, 241 F.3d at 733.  It admits that "[d]ilbit is more likely than lighter crude oils to persist within wetlands because of the higher amount of residual oil left behind after weathering, increased adhesion and resistance of dilbit to biodegradation," but then disregards its own disclosure by persisting in analyzing lighter crude oils anyway.  2019 FSEIS 5-42.  This is particularly concerning given one of the major spills that the Keystone I pipeline has experienced since 2017 spilled an estimated 383,000 gallons into a sensitive wetland in South Dakota.  Yet even as the 2019 FSEIS concedes that "the rate for large spills from TransCanada pipelines . . . is 1.7 times higher than the industry average" (2019 FSEIS 5-12), it nonetheless downplays the risk that such spills will occur on this Project near wetlands (2019 FSEIS 5-43).

87.    In view of these additional oil spill risks and unknowns, the 2019 FSEIS should have examined whether additional mitigation measures are possible

and advisable to avoid, as well as to identify and ameliorate, the Project's oil spill impacts.  For example, while the 2019 FSEIS acknowledges that "a large spill could affect soil productivity adversely," and "[i]n some cases . . . soil productivity would not likely return to prior levels," it does not address whether any new mitigation measures should be examined  to *prevent,* instead of merely *respond to*, the oil spills that the 2019 FSEIS appears to concede to be inevitable.  2019 FSEIS 5-30.

88.    But new mitigation measures to avoid spills are necessary if this Project were to proceed, because the impacts of a spill on waterways would be devastating.  For example, the Keystone XL Pipeline would cross the Missouri River upstream of all three intakes for the Fort Peck Reservation's water supply.  A spill from Keystone into the Milk or Missouri rivers upstream of the Reservation would destroy the only source of clean water available to the 30,000 people dependent on these intakes.  Declaration of Bill Whitehead in Support of Plaintiffs' Motion for Preliminary Injunction filed July 10, 2019 in *Indigenous Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.) ("Whitehead Dec.") (Dkt. 27-26) at ¶¶ 4-13.  Since Keystone would cross or pass near other rivers that provide potable water to other Indigenous communities, it would threaten their water supplies as well.  For example, it would cross the Cheyenne River less than 100 yards upstream from the southwest boundary of the Cheyenne River Reservation, threatening that Indigenous community and its water supply.  Declaration of LaVae High Elk Red Horse in Support of Plaintiffs'

Motion for Preliminary Injunction filed July 10, 2019 in *Indigenous Environmental Network v. Trump*, Case No. 19-CV-0028-GF-BMM (D. Mont.) (Dkt. 27-19) ("Red Horse Dec.") at ¶¶ 3-7; Lone Eagle Dec. at ¶¶ 3-6.

89.    Many of the waterways directly impacted by the Project are of great importance to the Indigenous communities because they depend on these waters for drinking, irrigation, livestock, and their cultural and religious practices.  A spill from the pipeline – which seems certain to occur – would significantly impact and potentially poison drinking and irrigation water for tens of thousands of people and their farmland.  As noted above:

> "The Keystone XL Pipeline would cross under the Milk River and the Missouri River just 10 and 14 miles upstream of [the] Wyota and Frazer irrigation intakes on the Missouri River, which supply the Fort Peck Reservation's extensive irrigation system, providing water to about 19,000 acres of highly productive farmland.  Downstream of the Wyota and Frazer irrigation intakes is the intake for the Wambdi Wahachanka "Eagle Shield" Water Treatment Plant that pumps water from the Missouri River, for potable use, to the inhabitants of the Fort Peck Reservation as well as other communities within Montana's four northeastern counties."

Whitehead Dec. at ¶ 6.  A pipeline spill upstream of these intakes would be devastating to the Fort Peck Reservation for two reasons.  First, that Reservation is wholly dependent on these three intakes for its potable water supply, as noted.

Second, an upstream oil spill would disable its water treatment plant. The Fort

Peck Reservation's water treatment plant "is not designed nor equipped to remove

hydrocarbon contaminants . . . that are present in crude oil and the diluent that is

used to facilitate its passage through pipelines. Were there to be a tar sands crude

oil leak contaminating the Missouri River, [the] water treatment plant would have

to close, resulting in the loss of the sole water supply for over 30,000 residents of

the Fort Peck Reservation and surrounding communities . . . , including four

hospitals and thirteen public schools." *Id. at* ¶ 7.

90.    Water supply contamination would have serious health impacts on

Indigenous communities that cannot be ignored. There are many vulnerable

families and individuals residing in the affected Indigenous communities who

have "cancer and other diseases attributed to contamination of their water supply."

Declaration of Angeline Cheek in Support of Plaintiffs' Motion for Preliminary

Injunction filed July 10, 2019 in *Indigenous Environmental Network v. Trump*,

Case No. 19-CV-0028-GF-BMM (D. Mont.) (Dkt. 27-6) ("Cheek Dec.") at ¶ 11.

These ongoing health risks and illnesses would be made worse should an oil spill

from Keystone prevent use of surface waters and force these communities to

resume reliance on the contaminated groundwater supplies that caused their ill

health in the first place.

91.    The impacted Indigenous communities rely on these rivers not only

for drinking water, but also for native medicines and edible plants that grow along

their riverbanks. Because of their unique dependence upon and interdependence

with the natural world, these communities would be profoundly and disproportionately harmed if Keystone spilled oil into their rivers.  As Indigenous community resident and spokesperson Joye Braun has testified to this Court,

> "[i]f the Keystone XL Pipeline should leak into any of these rivers, our people, our water supply, and our health and safety would be immediately impacted.  I frequently harvest native medicines and berries along the Cheyenne River downstream from where the KXL Pipeline would be constructed.  My family and I rely on these foods and medicines for our sustenance and health."

Braun Dec. (Dkt. 27-4) at ¶ 3.

92.     A spill would destroy more than just native foods and medicines.  It would also harm the spiritual, religious, cultural, and personal connections that many members of the Impacted Indigenous communities have with these waters. As Indigenous community resident Elizabeth Lone Eagle has testified to this Court,

> "[f]or us, life begins and ends with water.  We are born from and nourished by water.  It is our first medicine.  It enables our food to grow, our fish to live, and our game to thrive.  Our horses use the river to water, swim, frolic, and to clean themselves. . . .Should the KXL Pipeline rupture– as appears to us inevitable and has been predicted by the Final Environmental Impact Statement for the project – and leak into the Cheyenne River, White River

> or their tributaries, the resulting contamination of our water supply would
>
> be devastating to my family, our community, and the entire way of life on
>
> which our Tribes depend for survival."

Lone Eagle Dec. (Dkt. 27-15) at ¶¶ 3, 6.

93.     Indigenous community leader Kandi White has similarly attested to
the fact that if Keystone should spill into their rivers, the Indigenous communities
would suffer a profoundly deep sense of loss:

> "[c]ontamination of a river in this way is particularly painful for me and my
>
> people.  As Mandan, Hidatsa, Arikara people, we always lived along
>
> waterways and farmed along the fertile floodplains.  Consequently, it is very
>
> important to us that we remain close to and make frequent use of our
>
> rivers."

White Dec. (Dkt. 27-24) at ¶ 10.  In testimony to this Court, Indigenous
community resident LaVae High Elk Red Horse has summed up the totality of this
impact on the Indigenous communities as follows:

> "[b]ecause we . . . depend on the great Cheyenne River and its tributaries for
>
> our sustenance, the Keystone XL Pipeline would threaten all that we live for
>
> and our cultural and religious legacy as we live it every day."

Declaration of Lavae High Elk Red Horse in Support of Plaintiffs' Motion for
Preliminary Injunction filed July 10, 2019 (Dkt. 27-19) at ¶ 4.

94.     The 2019 FSEIS also understates Keystone's risks to and impacts on

imperiled species should the pipeline leak.  By improperly downplaying the frequency, duration, and extent of oil spills, Defendants obfuscate the Project's foreseeable impacts on listed species.  With the sole exception of the American burying beetle, the 2019 FSEIS – and BLM's 2019 Biological Assessment on which it is based –  assume that the Project would not adversely affect listed species, including the interior least tern, whooping crane, pallid sturgeon, piping plover, Topeka shiner, northern long-eared bat, western-fringed prairie orchid, and others.  2019 FSEIS 4-53 to 4-55; *see also* 2019 Biological Assessment.  But this assumption is based on the false premise that the Project will not spill oil into their habitat.

95.    This assumption is baseless, for the FSEIS elsewhere admits, as it must, that Keystone could spill oil anywhere along its 882-mile route.  And, the 2019 FSEIS concedes that the potential biological impacts of a spill include "direct and acute mortality; sub-acute interference with feeding and reproductive capacity; disorientation and confusion; reduced resistance to disease; tumors; reduced or lost sensory perceptions; interference with metabolic, biochemical and genetic processes; and many other acute or chronic effects," as well as "consequences on local flora and fauna."  2019 FSEIS 5-44 to 5-45.  Yet neither the 2019 FSEIS nor the 2019 Biological Assessment tie these observations to the potential population-level impacts of oil spills from Keystone on listed species.  This omission violates NEPA's "hard look" standard.

//

### *Greenhouse Gas and Climate Change*

96.     The 2019 FSEIS likewise fails to take the requisite hard look at the

Project's greenhouse gas ("GHG") impacts, as NEPA requires.  It does not correct

the deficiencies that this Court previously identified in the 2014 SEIS.  That SEIS

failed to address the cumulative GHG emissions associated with the Project and

related and connected pipelines.  It also failed to use updated modeling

information in presenting the Project's impacts.  For these reasons, this Court

ruled that State had "failed to paint a full picture of emissions for these connected

actions, and, therefore, ignored its duty to take a 'hard look.'"  *IEN v. State*, 347

F.Supp.3d at 578.

97.     Just like the 2014 SEIS, the 2019 FSEIS does not take a hard look at

the Project's GHG and climate change impacts.  Although the 2019 FSEIS reveals

that the Project could increase *annual* emissions by between 174.7 and 178.3

million metric tons of $CO_2$-equivalent emissions (2019 FSEIS 4-81), it fails to

analyze the *compounding* effect of these emissions.  GHGs do not dissipate.

Instead, they remain in the atmosphere for decades, causing warming to

cumulatively increase over time as each year's increased emissions add to this

growing impact.  The FSEIS fails to acknowledge and analyze this cumulative

worsening of Keystone's annual GHG impacts.  2019 FSEIS 7-20.

98.     In 2018, the Intergovernmental Panel on Climate Change ("IPCC")

issued a special report warning of the impacts of global warming of just 1.5°

Celsius.[2]  Its stark conclusion is that the entire planet – particularly major

contributors such as the United States – must reduce $CO_2$ emissions by at least

45% in the next 12 years compared with 2010 levels and achieve net zero $CO_2$

production by 2050, in order to stave off potentially calamitous hothouse

scenarios, ocean acidification, and other catastrophic and irreversible changes to

the planet.  *See*, *e.g.*, 2018 IPCC 1.5° Report, Summary for Policy Makers, pp. 5,

12.

        99.    Yet, the 2019 FSEIS fails to recognize and address the fact that

approval of Keystone XL would make it more likely that the planet will

experience a temperature rise of 3° Celsius by 2100.  This level of warming will

cause calamitous permafrost melting, accelerated sea level rise, ocean

acidification, and widespread and irreversible destruction of what were once

carefully-balanced natural climatic control systems.  The 2019 FSEIS

unreasonably disregards these increasingly likely significant climate impacts, and

the Project's contribution thereto.  While it admits that the Project's GHG effects

will be significant, it downplays those potentially disastrous impacts, stating that

"the proposed Project would not by itself significantly alter the trajectory of global

climate change."  2019 FSEIS 4-76, D-53.  But this argument fails to see the forest

---

[2]    The 2018 IPCC Special Report on Global Warming of 1.5°C ("2018 1.5°
Report") is available in full at:
https://www.ipcc.ch/site/assets/uploads/sites/2/2019/06/SR15_Full_Report_High_
Res.pdf.

for the trees.  Although an individual tree by itself does not make a forest, the *addition* of just one tree could be the increment that makes a group of trees a forest.  So too here, no one individual energy project will create enough GHG emissions by itself to cause the earth to enter a "hothouse" state from which escape becomes impossible.  But, any one project – particularly this massive oil development Project – could be the incremental *addition* that pushes the planet over that precipice.

100.   The 2019 FSEIS also impermissibly downplays the likely impacts that climate change will have on the Project, should it be built.  2019 FSEIS 4-101 to 4-102.  It fails to take the requisite hard look at how climate change could alter Project operations, and instead relies upon sheer speculation that periodic pipeline inspection will "mitigate risk of damage from severe weather" caused by climate change.  2019 FSEIS 4-102.  It also fails to address the likelihood – which recent oil market contractions have shown to be increasingly inevitable as renewable energy rapidly expands – that the Project will become a stranded asset as climate change undermines and ultimately eliminates the market for Canadian tar sands altogether.  *Id.*

### Market Analysis of the Impact of Oil Prices on Tar Sands Production

101.   The 2014 SEIS incorrectly "conditioned much of its analysis . . . on the price of oil remaining high." *IEN v. State*, 347 F.Supp.3d at 576.  However, "significant changes in oil prices . . . have occurred since 2014." *Id.*  The 2014

SEIS admits that "lower-than-expected oil prices could affect the outlook for oil sand production," but the State Department still failed to address important updated information regarding the price of oil. *Id*.

102.   The 2019 FSEIS attempts to justify the 2014 SEIS' failure to analyze falling oil prices by presenting numerous, widely divergent projections about oil prices. 2019 FSEIS 1-12 to 1-23. It claims that "crude oil prices [for the Western Canadian Crude Oil Market] are likely to increase over the medium to long terms such that the recent low price of crude oil globally . . . would not be a driving factor in the crude oil industry's decision regarding development of future [Western Canadian Sedimentary Basin ("WCSB")] production facilities." 2019 FSEIS 1-22. But this conclusion does not follow from the evidence. As the 2019 FSEIS reveals, subsequent to the 2014 SEIS, "global crude oil prices declined more than 50 percent from peak prices." 2019 FSEIS 1-18. The 2019 FSEIS, however, wrongly assumed that this decline was merely a temporary setback, based on the erroneous premise that since 2016 oil prices had "partially recovered to [an] average price 25 percent lower than 2014 prices." 2019 FSEIS 1-18. Like the 2014 SEIS, the 2019 FSEIS' sanguine premise has been refuted rather than supported by subsequent events which, as explained below, have pushed oil prices down and kept them there. *IEN v. State*, 347 F.Supp.3d at 576.

103.   Despite a brief period of recovery, the price of WCSB oil has plummeted once again. "Prices for Canadian oil continue[d] to sink" after the

most recent Keystone pipeline spill,[3] and continued to fall in the first half of 2020
partially as a result of the Covid-19 pandemic, to as low as $3.50 per barrel in
April 2020.  At the time of this Complaint, WCSB prices have recently risen to
around $30 per barrel.  (*See, e.g.*, *oilprice.com/Oil Price Charts/Western
Canadian Select* (Nov. 20, 2020).)  However, that price is less than half the
average price in 2014, which generally ranged between the low $60's and the low
$80s per barrel.  Therefore, the 2019 FSEIS' assumption that oil prices would at
least partially recover  "over the medium . . . term[]" has proven to be incorrect, as
has the 2019 FSEIS' associated market analysis.

### *Environmental Justice*

104.   The 2019 FSEIS likewise fails to take the necessary "hard look" at
the Project's disproportionate impact on Indigenous communities, including the
severe human health and safety impacts they are likely to face should Keystone be
built and begin operation.  As Plaintiffs' members have testified,

> "construction of man-camps . . . would unleash severe social impacts within
> nearby rural communities, particularly the Indigenous communities. . . . The
> direct effects [of man camps] include violence against Native American
> women and children, including murders, abductions, rape and other forms of
> physical violence, exposure to drugs including methamphetamines and

---

[3]   Cunningham, Nick, *Canadian Oil Prices Crash After Keystone Spill*,
oilprice.com, November 7, 2019, attached as Exhibit 9 to Plaintiffs' November 18,
2019 comments on the draft 2019 SEIS.  *See* 2019 FSEIS E-127.

heroin, and sex trafficking.  The indirect effects include displacement of

local residents from housing due to doubling and tripling of rental costs,

inflation in other necessities of life including food, clothing and services,

the breakdown of public safety and family and community support

networks, and the overall degradation in quality of life due to exposure to

alcohol and drug abuse and resulting addiction, and increased domestic and

sexual violence."

Cheek Dec. (Dkt. 27-6) at ¶¶ 8, 29; *see also* Cheek Dec. at ¶¶ 4, 12, 14, 15; Braun

Dec. (Dkt. 27-4) at ¶¶ 5, 7; Red Horse Dec. (Dkt. 27-7) at ¶¶ 5, 7, 8; Lone Eagle

Dec. (Dkt. 27-15) at ¶ 5.

105.   The FSEIS completely fails to consider the impacts of the Project's

man-camps on the surrounding Indigenous communities.  FSEIS 2-6 to 2-8.  "The

impact of the man-camps is not limited to the acreage that would be developed.

Their effects would extend far beyond the directly disturbed acreage, with far-

reaching consequences for the local residents of surrounding rural communities."

Corrected Declaration of Kathleen Meyer in Support of Plaintiffs' Motion for

Preliminary Injunction filed in *Indigenous Environmental Network v. Trump*, Case

No. 19-CV-0028-GF-BMM (D. Mont.), October 7, 2019 (Dkt. 65-2) at ¶ 14.  Of

particular concern, the "man-camps would have substantial adverse impacts on the

adjacent Indigenous communities . . . . includ[ing] violence against Native

American women in the vicinity of these camps, and increased drug use and

alcohol abuse within the nearby Native American communities."  Braun Dec.

(Dkt. 27-4) at ¶ 7.

106.   "[R]eservation communities are the closest towns and thus likely to be used by the oil workers for 'entertainment.'"  Braun Dec. (Dkt. 27-4) at ¶ 6.  In the past, when man-camps were constructed for other oil development projects in the area, the Indigenous communities were disproportionately, and severely, impacted.  For example, "[t]he surge of oil field and pipeline workers [from development of the Bakken oil and gas fields] resulted in much higher crime rates, including murders, abductions, rapes and other forms of sexual violence, drug and alcohol abuse, addiction and sex trafficking."  Cheek Dec. (Dkt. 27-6) at ¶ 12. That "surge in violence against Native Americans, particularly women  and children, then moved north into the Fort Peck Reservation, resulting in widespread criminal activity," including attempts to abduct juvenile females.  *Id.* at ¶ 14.  This criminal activity prompted the "Fort Peck tribal courts [to] add[] a human trafficking code to [the] Fort Peck Tribes' Comprehensive Code of Justice."  *Id.* "At the same time, [the Fort Peck] Reservation experienced a tremendous increase in sexually-transmitted diseases . . . [and i]ncidents of drug and alcohol abuse and addiction."  *Id.* ar ¶ 15.

107.   Man-camps near other Indigenous communities have likewise disproportionately impacted those communities, exposing them to increased rates of drug use and violence, and consequent erosion of public safety and loss of quality of life.  "The placement of oil and gas pipeline-related man-camps near Indigenous communities elsewhere in South Dakota and North Dakota has been

associated with physical assaults against and murders of Native American women, as well as drug and alcohol abuse within Native American communities." Red Horse Dec. (Dkt. 27-7) at ¶ 5; *see also* Lone Eagle Dec. (Dkt. 27-15) at ¶ 7; Braun Dec. (Dkt. 27-4) at ¶¶ 5, 7; Meyer Dec. (Dkt. 65-2) at ¶ 14; Cheek Dec. (Dkt. 27-6) at ¶ 4. These horrific effects are impacts on the human environment, cognizable under NEPA. 40 C.F.R. § 1508.14 ("[w]hen . . . social and . . . physical environmental effects are interrelated, then the [EIS] will discuss all of these effects on the human environment"). Yet the 2019 FSEIS fails to disclose these impacts and explain how they will disproportionately harm the impacted Indigenous communities. This omission violates NEPA.

108. While the 2019 FSEIS claims that "[w]orkers who violate [TransCanada's] camp Code of Conduct would be dismissed," it does not disclose, let alone discuss, any of the requirements of that purported "camp Code of Conduct," depriving the public of any opportunity to evaluate its claimed efficacy as a mitigation measure. 2019 FSEIS 2-8. Nor does it explain how – or who – will determine if a violation has occurred. Nor does it reveal if this measure has ever been used. Without evidence documenting and comparing its actual use in response to the many documented acts of man-camp-related violence against Indigenous women and children, it is just empty words on a piece of paper.

109. Furthermore, dismissal is only one of the many mitigation measures that the FSEIS should have considered and evaluated to halt these horrendous depredations by man-camp-housed transients against Indigenous communities.

Other measures that should have been examined include more thorough

background checks on employees, employee education and supervision,

restrictions on employee travel to nearby Indigenous communities, curfews,

enforceable prohibitions against alcohol and drugs, enhanced communication with

local – including tribal –  law enforcement agencies to develop coordinated

responses to criminal activity, and financial and logistical support to local and

tribal law enforcement agencies to facilitate their investigation and criminal

prosecution of crimes against Indigenous community members.  The FSEIS should

have evaluated whether TransCanada should be required to undertake these other

measures to cooperate and coordinate with law enforcement agencies both locally

and regionally to facilitate questioning, investigation, and apprehension when

appropriate.

110.   Yet the FSEIS is silent on these critically needed measures to address

and mitigate these violent acts against Indigenous women and children.  By

limiting its consideration of the potential responses to man-camp-related violence

against Indigenous women and children to quiet, private dismissal of employees

who violated TransCanada's undisclosed "camp Code of Conduct," the 2019

FSEIS downplays the severity of these impacts and their disproportionate effects

on Indigenous communities.  At the same time, it fails to identify and evaluate a

reasonable range of potentially effective mitigation measures.  Consequently, it

ignores NEPA's command that federal agencies take a hard look at Keystone's

impacts on the human environment, and at measures that would reduce those

impacts.

## DEFENDANTS' APPROVAL VIOLATES NEPA BECAUSE IT EXCEEDS THE SCOPE OF THE PROJECT CONSIDERED IN THE FSEIS

111.   Defendant BLM's ROD incorporates and references the Project's Plan of Development ("POD").  The POD indicates that the Project includes the construction of seven man camps in Montana, four in South Dakota, and one in Nebraska – a total of 12 camps.  POD 13-14.  This contradicts the 2019 FSEIS, which states that "a total of 11 camps are currently being considered, 6 in Montana, 4 in South Dakota and 1 in Nebraska."  2019 FSEIS 2-6.  Indeed, the 2019 FSEIS states that the Proposed Whitewater Camp in Montana "has been removed" from the Project.  *Id.*  Yet despite this purported removal, the Whitewater Camp is included in the maps that provide the Project overview included within BLM's ROD (Appendix B, Map A).  Thus, BLM's approval appears to improperly exceed the scope of the Project it studied and disclosed to the public.

112.   For each of the foregoing reasons, the Corps' issuance of a FONSI on January 6, 2017, State's issuance of its deficient FSEIS on December 20, 2019, and BLM's reliance on that FSEIS in issuing its ROD approving the Project on January 22, 2020, violated NEPA, and therefore under the APA, must be set aside.

//

//

//

## SECOND CLAIM FOR RELIEF

## (Violation of the Mineral Leasing Act)

## (Against BLM, Director John Mehlhoff of the Montana/Dakotas State Office of BLM and Interior Secretary David Bernhardt)

113.    The paragraphs set forth above and below are realleged and incorporated herein by reference.

114.    The Mineral Leasing Act, 30 U.S.C. sections 181, et seq. ("MLA"), governs the grant of rights-of-way and related temporary permits for oil pipelines through federal land.  30 U.S.C. § 185.

115.    The MLA requires BLM to address the environmental impacts of its grants of rights-of-way and temporary permits for pipelines in several ways.  30 U.S.C. § 185(h).  First, it specifies that the approval of rights-of-way and temporary permits is not exempt from applicable NEPA requirements.  30 U.S.C. § 185(h)(1).  Second, it directs that for any new project that "may have a significant impact on the environment," BLM "shall require the applicant to submit a plan of construction, operation, and rehabilitation for such right-of-way or permit which shall comply with" the MLA's enumeration of environmental mandates.  30 U.S.C. § 185(h)(2).  Third, it commands that BLM "shall issue regulations or impose stipulations which shall include . . . (A) requirements for restoration, revegetation, and curtailment of erosion of the surface of the land; (B) requirements to insure that activities in connection with the right-of-way or permit

will not violate applicable air and water quality standards nor related facility siting standards . . . ; (C) requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety; and (D) requirements to protect the interests of individuals living in the general area of the right-of-way or permit who rely on the fish, wildlife and biotic resources of the area for subsistence purposes." *Id*.

116.   BLM's regulations implement the MLA's environmental  mandates. They direct that, to insure that the foregoing requirements for environmental protection are carried out, the applicant must, "[t]o the extent practicable, comply with all existing and subsequently enacted, issued, or amended Federal laws and regulations." 43 C.F.R. § 2885.11(b)(1).  They direct that the applicant must "[c]omply with project-specific terms, conditions, and stipulations, including requirements to: . . . [c]ontrol or prevent damage to scenic, aesthetic, cultural, and environmental values, including fish and wildlife habitat, and to public and private property and public health and safety."  43 C.F.R. § 2885.11(b)(9)(iii).

117.   Contrary to the foregoing statutory and regulatory commands, BLM did not conduct an adequate environmental review nor prepare and impose vitally needed environmental safeguards on the Project.  For example, BLM uncritically relied on State's deficient FSEIS instead of addressing the many deficiencies in State's FSEIS that Plaintiffs and others identified in their detailed comments on the Draft SEIS.  Contrary to the MLA's environmental mandates, BLM proceeded

to issue the right-of-way grants and temporary use permits for the Project notwithstanding State's numerous NEPA errors and omissions that are detailed in the First Claim for Relief set forth above.

118.   BLM further violated the MLA's environmental mandates by failing to assure that the Project would in fact include adequate "requirements for restoration, revegetation, and curtailment of erosion of the surface of the land[,] . . . requirements to insure that activities in connection with the right-of-way or permit will not violate applicable air and water quality standards nor related facility siting standards[,] . . . requirements designed to control or prevent (i) damage to the environment (including damage to fish and wildlife habitat), (ii) damage to public or private property, and (iii) hazards to public health and safety[,] and . . . requirements to protect the interests of" Indigenous communities "living in the general area of the right-of-way or permit who rely on the fish, wildlife and biotic resources of the area for subsistence purposes." 30 U.S.C. § 185(h)(2).  Nor did BLM assure that the permit applicant, TransCanada, would "prevent damage to scenic, aesthetic, cultural and environmental values, including fish and wildlife habitat, and . . . public and private property and public health and safety."  43 C.F.R. § 2885.11(b)(9)(iii).

119.   For each of the foregoing reasons, BLM's approval of the ROW and TUP for the Project violated the MLA, and therefore under the APA, must be set aside.

## THIRD CLAIM FOR RELIEF

## (Violation of the Federal Land Policy and Management Act)

## (Against BLM, Director John Mehlhoff of the Montana/Dakotas State Office

## of BLM and Interior Secretary David Bernhardt)

120.   The paragraphs set forth above and below are realleged and incorporated herein by reference.

121.   The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. section 1701 *et seq*., directs that

> public lands be managed in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use.

43 U.S.C. § 1701(a)(8).

122.   In furtherance of this mandate, FLPMA requires BLM to limit to the extent feasible the natural resource damage that Keystone would cause along its right-of-way.  43 U.S.C. § 1765.  FLPMA commands that BLM "take any action necessary to prevent unnecessary or undue degradation of the lands."  43 U.S.C. § 1732(b); 43 C.F.R. § 2801.2(b).  It further requires that each right-of-way "be

- 57 -

limited to the ground which the Secretary concerned determines . . . will do no unnecessary damage to the environment" (43 U.S.C. § 1764(a)), and "contain . . . terms and conditions which will . . . minimize damage to scenic and esthetic values and fish and wildlife habitat and otherwise protect the environment" (43 U.S.C. § 1765(a)).

123.   These requirements are strictly enforced and cannot be easily counterbalanced, nor may they ever be displaced, by project proponents' claims of inconvenience or cost. *Trout Unlimited v. U.S. Dept. of Agriculture,* 320 F.Supp.2d 1090, 1108 (D. Colo. 2004).  "FLPMA itself does not authorize [a federal agency's] consideration of the interests of private facility owners as weighed against environmental interest such as protection of fish and wildlife habitat." *Id*.  Indeed, FLPMA "simply does not allow [a federal agency] to ignore options that would minimize environmental degradation because of the costs to private parties and difficulty in implementation." *Id*.

124.   Contrary to these environmental mandates, BLM approved the right-of-way grant for Keystone, despite its significant impacts that will cause unnecessary and undue degradation of the environment.  Notably, spills are expected along the pipeline every year and a leak of up to 16,600 barrels per day would go undetected "in real time" by the automatic leak detection systems.  A single significant spill, like those that have occurred along the original Keystone Pipeline, would unnecessarily and unduly degrade the environment.  Furthermore, the Project poses a direct threat to the historic and cultural sites important to

Indigenous communities, and will disproportionately impact those communities. Because Keystone as approved will unduly degrade the human environment, BLM's approvals violate FLPMA.

125.   BLM also failed to consider terms and conditions that would avoid or reduce the Project's impacts because BLM has not adequately disclosed and examined those impacts, and mitigation measures that would reduce them.  As noted, FLPMA "simply does not allow [a federal agency] to ignore options that would minimize environmental degradation." *Trout Unlimited v. U.S. Dept. of Agriculture,* 320 F.Supp.2d at 1108.  Because BLM has not been fully informed of the Project's potential impacts, it cannot properly evaluate and guard against the Project's environmental harms as required by FLPMA.

126.   Because Keystone will cause unnecessary and undue degradation to the environment, and BLM failed to explore, evaluate and adopt terms and conditions that would avoid or reduce the Project's foreseeable impacts, BLM's ROD violates FLPMA and therefore under the APA, must be set aside.

**FOURTH CLAIM FOR RELIEF**

**(Violation of the Endangered Species Act)**

**(Against Fish and Wildlife Service, its Director Skipwith, and Interior Secretary David Bernhardt)**

127.   The paragraphs set forth above and below are realleged and incorporated herein by reference.

128.   Any action "authorize[d], fund[ed], or carr[ied] out" by a federal agency which may affect listed species or their critical habitat is subject to inter-agency consultation under section 7 of the ESA, 33 U.S.C. section 1536.  "A federal agency must initiate formal consultation if its proposed action 'may affect' listed species or critical habitat, and any possible effect, whether beneficial, benign, adverse, or of an undetermined character, triggers the formal consultation requirement."  *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496 (9th Cir. 2011) (internal quotes omitted).

129.   The consultation process under section 7 of the ESA requires BLM as the "action agency" to consult with the Secretary of Interior to ensure that BLM's actions are "not likely to jeopardize the continued existence of any endangered species . . . ."  16 U.S.C. § 1536(a)(2).  In order to fulfill this statutory mandate, both BLM and FWS must use the "best scientific and commercial data available."  *Id.*  Except for listed species that inhabit the ocean, by statute and regulation FWS is the agency within the Department of the Interior with specific expertise in the habitat requirements, population trends and ecological health of endangered and threatened species.  Therefore, when conducting this required consultation it must apply that expertise to independently evaluate claims by action agencies that their proposed actions will not harm listed species.

130.   The consultation process often begins with informal consultation, an "optional process that includes all discussions, correspondence, etc., between the Service and the Federal [action] agency or the designated non-Federal

representative, designed to assist the Federal agency in determining whether formal consultation or a conference is required." 50 C.F.R. § 402.13(a). If, during informal consultation, both the action agency *and* the Department of the Interior's consulting agency with expertise in listed species – in this case FWS – determine that "the action is not likely to adversely affect listed species," then the consultation process is terminated. *Id.* This termination requires specific, written concurrence by FWS. *Id.*

131. In the event either of the agencies determines that the proposed action may adversely affect listed species, they must initiate formal consultation. 50 C.F.R. § 402.14. Formal consultation requires a detailed inquiry into the scope and extent of adverse effects upon listed species which may result from the proposed action. *Id.* The formal consultation process must result in a biological opinion reaching one of two conclusions: that the project will, or will not, jeopardize listed species. 50 C.F.R. § 402.14(e).

132. If the project will jeopardize the continued existence of a listed species, harming or killing ("taking") that species creates civil and criminal liability under section 9 of the ESA. If, however, the biological opinion concludes that the project will not jeopardize the continued existence of the listed species, but will cause the "incidental take" of members of that species, FWS will provide an incidental take statement authorizing a certain number or extent of takings allowed, and specifying "reasonable and prudent measures" required to minimize the impact. 50 C.F.R. § 402.14(i).

133.    While BLM's 2019 Biological Assessment acknowledges that exposure to oil spills could harm listed species, it dismisses the likelihood of harm as insignificant "due to the low probability" that a spill would impact species' habitat.  *E.g.* 2019 Biological Assessment 47-48, 51 (interior least tern), 65-67 (whooping crane), 82-83 (pallid sturgeon), 89 (Topeka shiner), 130-131 (northern long-eared bat), 165-166 (western-fringed prairie orchid), 146-147 (piping plover).  It does so even though it acknowledges that spills are *likely* to occur, within the "known range" that may be occupied by these species, at a frequency of *nearly twice per year* (0.6 years between spills) for the whooping crane and at lower, but still significant, frequencies for the other listed species, down to the lowest frequency, once every 33.3 years, for the Topeka shiner.  *Id.*  Because FWS failed to require formal consultation even though, as the agency with expertise in protection of listed species, it knew that formal consultation was needed to address these substantial, admitted risks, FWS failed to perform its consultation duties under section 7 of the ESA.  Its failure to proceed in the manner required by law was final agency action that violates the APA.  *American Rivers*, 126 F.3d at 1124-1125.

134.    The Corps approved on January 6, 2017 a revised NWP 12 under section 404(e) of the CWA, 33 U.S.C. section 1344(e), allowing the discharge of dredged or fill materials into waters of the United States from  "pipeline[s] for the transportation of any . . . liquid . . . substance" such as crude oil, without consulting with FWS regarding the Project's impacts on listed species and their

- 62 -

critical habitat.  82 Fed.Reg. 1860, 1985, 1999-2000 (January 6, 2017).  The Corps assumed that the potential discharge of dredged or fill material from the Project would, as permitted under NWP 12, not result in the loss of greater than one-half acre of jurisdictional waters for each single and complete project.  *Id.*

135.   The Corps did not conduct consultation under the ESA for three reasons.  First, it assumed that NWP 12 would not affect listed species or critical habitat because General Condition 18 to NWP 12 provides that a nationwide permit does not authorize an activity that is "likely to directly or indirectly jeopardize the continued existence of a" listed species or that "will directly or indirectly destroy or adversely modify the critical habitat of such species."  82 Fed.Reg. at 1873-1874, 1999.  However, the Corps allowed the permittee to determine whether its permit would have those effects, rather than making that determination itself as Congress intended.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14(a); *Northern Plains Resource Council v. U.S. Army Corps of Engineers*, CV-19-44-GF-BMM, Order filed April 15, 2020, at page 12.

136.   Second, the Corps assumed that NWP 12 had not caused impacts to listed species and their critical habitat in the past.  82 Fed.Reg. at 1873-1874.  But in fact, the Corps knew from its own observations that "activities authorized by past versions of NWP 12 'have resulted in direct and indirect impacts to wetlands, streams and other aquatic resources,' . . . . resulting in permanent losses of aquatic resource functions and services."  *Northern Plains Resource Council v. U.S. Army Corps of Engineers*, *supra*, Order filed April 15, 2020, at page 12.  Indeed, "[t]he

Corps itself has stated that discharges authorized by NWP 12 *'will* result in a minor incremental contribution to the cumulative effects to wetlands, streams, and other aquatic resources in the United States.'" *Id*. at page 13 (emphasis in original).

137.   Third, the Corps assumed that its failure to conduct ESA consultation at the programmatic stage of CWA section 404 permitting would be cured by its subsequent consultation when project-specific approvals involving General Condition 18 review were issued.  82 Fed.Reg. at 1999.  But settled caselaw makes clear that ESA consultation must be conducted at the programmatic stage where, as here, subsequent project-level consultation would come too late to fully protect listed species and their habitat.  *Northern Plains Resource Council v. U.S. Army Corps of Engineers*, *supra*, Order filed April 15, 2020, at page 16, citing *Conner v. Burford*, 848 F.2d 1441, 1453-58 (9th Cir. 1988).  This Court pointed out that conducting ESA consultation only at the project-approval stage would not "avoid piecemeal destruction of species and habitat."  *Id*. at page 18, citing *National Wildlife Foundation v. Brownslee*, 402 F.Supp.2d 1, 9-11 (D. D.C. 2005).

138.   The Corps' factual and legal errors and omissions summarized above are reviewable by this Court under the citizen-suit provision of the ESA, 16 U.S.C. section 1540(g), following maturation of the 60-day notice of intent to sue required by that provision, 16 U.S.C. section 1540(g)(2).  Accordingly, Plaintiffs intend to promptly transmit this required notice to the Corps as necessary to secure this Court's jurisdiction over this citizen suit claim, which will be added by timely

amendment to this Complaint.

139.   By accepting the Corps' erroneous conclusion that the Project's NWP 12 does not affect listed species or critical habitat, FWS likewise failed to perform its duty to adequately consult with the Corps under the ESA.  Its failure to proceed in the manner required by law was final agency action that violates the APA. *American Rivers*, 126 F.3d at 1124-1125.

140.   On December 23, 2019, FWS improperly concluded informal consultation as to these species by concurring in the 2019 Biological Assessment's conclusions.[4]  Yet as noted, the 2019 Biological Assessment fails to provide an adequate basis for FWS' determination that Keystone is "not likely to adversely affect" these species.  In its concurrence letter, FWS failed to disclose, analyze and address Keystone's adverse oil spill impacts on the listed species it purportedly determined were not likely to be "adversely affect[ed]" by Keystone.

141.   FWS' December 23, 2019 concurrence letter constitutes final agency action that violates the APA.  *American Rivers*, 126 F.3d at 1124-1125.

142.   By issuing its December 23, 2019 concurrence letter based upon, and without independently and critically evaluating, BLM's inadequate 2019 Biological Assessment, FWS violated the ESA, 16 U.S.C. section 1536(a), and its implementing regulations, 50 C.F.R. part 402.  Because FWS issued its

---

[4]   On December 23, 2019, FWS also issued a Biological Opinion specific to Keystone's impacts to the American burying beetle.

concurrence without requiring formal consultation, despite the BA's deficiencies, and its concurrence constitutes final agency action, FWS failed to proceed in accordance with law in violation of the APA.  5 U.S.C. section 706(2)(A) and (D); *American Rivers*, 126 F.3d at 1124-1125.  By issuing its concurrence without an adequate factual and scientific basis, and without reliance upon the best scientific and commercial data available, FWS's approval of the Project violated the ESA and therefore under the APA, must be set aside.  16 U.S.C. § 1536(a)(2); 5 U.S.C. § 706(2).

## FIFTH CLAIM FOR RELIEF

## (Request for Declaratory Judgment Stating that Executive Order 13,867 Does Not Save President Trump's 2019 Permit from Invalidation Due to that Permit's Fatal Conflict with Executive Order 13,337)

## (Against All Defendants)

143.   The paragraphs set forth above and below are realleged and incorporated herein by reference.

144.   Plaintiffs request this Court's declaratory judgment stating that President Trump's issuance of Executive Order 13,867 on April 10, 2019, does not save President Trump's March 29, 2019 Presidential Permit from invalidation due to that permit's fatal conflict with Executive Order 13,337 for two reasons.  First, by its terms Executive Order 13,867 does not apply to the 2019 Permit.  Second, even if it did, it could not be applied retroactively to validate the 2019 Permit.

145.   Plaintiffs are entitled to declaratory relief under 28 U.S.C. section

2201 because an actual controversy exists between Plaintiffs and Defendants as to whether Executive Order 13,867 validates the 2019 Permit despite the 2019 Permit's violation of Executive Order 13,337.  Plaintiffs contend that Executive Order 13,867 does not validate the 2019 Permit, and Defendants deny this contention.  The grounds for Plaintiffs' contention are as follows:

146.   The first reason that Executive Order 13,867does not validate the 2019 Permit is that, by its express terms, it does not apply to the 2019 Permit. Rather, its section 3 provides only that "[a]ll permits heretofore issued pursuant to the orders enumerated in section 2(k) of this order [i.e., permits issued pursuant to Executive Order 13,337 or its predecessor, Executive Order 11,423] and in force at the date of this order, shall remain in full effect in accordance with their terms . . . ."  The 2019 Permit was not issued "pursuant to" Executive Order 13,337.  To the contrary, it was, by its own terms, issued "*notwithstanding*" Executive Order 13,337.  84 Fed.Reg. 13101 (March 29, 2019) (emphasis added).  And, on its face, the 2019 Permit is in direct conflict with, rather than "pursuant to," the terms of Executive Order 13,337.  Indeed, the 2019 Permit violates the requirements of Executive Order 13,337 in at least seven material respects, as Plaintiffs have consistently pointed out in their previous (and still pending) litigation challenging the 2019 Permit.

147.   Executive Order 13,867 does not once reference President Trump's 2019 Permit.  Indeed, it contains no language that might be deemed to expressly apply to that permit, let alone to cure that permit's conflicts with applicable law as

necessary to validate that permit notwithstanding such conflicts.  Rather, although Executive Order 13,867 does contain language in section 3 that might be construed to validate some transboundary permits, that language clearly does not apply to the 2019 Permit.  Section 3, entitled "Existing Permits," states as follows:

"All permits heretofore issued *pursuant to* the orders enumerated in section 2(k) of this order, and in force at the date of this order, shall remain in full effect in accordance with their terms unless and until modified, amended, suspended, or revoked by the appropriate authority."

*Id*. (emphasis added).

Section 2(k) of Executive Order 13,867, in turn, states in full as follows: "Executive Order 13337 of April 30, 2004 (Issuance of Permits With Respect to Certain Energy-Related Facilities and Land Transportation Crossings on the International Boundaries of the United States) and Executive Order 11423 of August 16, 1968 (Providing for the Performance of Certain Functions Heretofore Performed by the President With Respect to Certain Facilities Constructed and Maintained on the Borders of the United States), as amended, are hereby revoked."

*Id*.

148.    Thus, while section 3 plainly preserves, "in full effect," all permits that were "heretofore issued pursuant to the orders enumerated in section 2(k) of this order," it does not preserve, in full effect or otherwise, any permits that were *not* "issued pursuant to the orders enumerated in section 2(k) of this order."  *Id*.

The 2019 Permit was manifestly *not* issued pursuant to either Executive Order 11,423 or Executive Order 13,337.  As noted, by its terms, the 2019 Permit was expressly issued "notwithstanding Executive Order 13,337" rather than "pursuant to" that order.  84 Fed.Reg. 13101.  And, since the 2019 Permit was issued 15 years after Executive Order 11,423 had been superseded by its successor, Executive Order 13,337, the 2019 Permit was certainly not issued pursuant to the now obsolete Executive Order 11,423.  In any event, the 2019 Permit would have just as many conflicts with Executive Order 11,423 as it has with Executive Order 13,337.

149.   The reasons why the 2019 Permit expressly provides that it was issued "notwithstanding" Executive Order 13,337 are quite evident from an examination of its many, substantive conflicts with the terms of Executive Order 13,337.  It directly violates the express terms of Executive Order 13,337 in at least seven material respects, as detailed below.  Each of these seven reasons is sufficient in itself to demonstrate that the 2019 Permit was manifestly not issued "pursuant to," and was instead issued "notwithstanding," the contrary language and intent of Executive Order 13,337.

150.   First, the 2019 Permit excludes the United States Secretary of State from any participation in the formulation, review, approval and administration of the 2019 Permit.  Executive Order 13,337, by contrast, expressly mandates the Secretary of State's direct, central and detailed involvement with all aspects of transboundary permits.  *Id*. at §§ 1(a) ("the Secretary of State is hereby designated

and empowered to receive all applications for Presidential permits . . . for the construction . . .at the borders of the United States, of facilities for the exportation or importation of petroleum"); 1(b) ("Upon receipt of a  completed application pursuant to paragraph (a) of this section, the Secretary of State shall [take actions to assure and facilitate its examination by the appropriate officials and agencies of the federal government]"); 1(c) and 1(d) (the Secretary of State shall receive comments from those federal officials and agencies and provide them additional information as necessary to enable them to provide their views to the Secretary); 1(e) ("The Secretary of State may also consult with such State, tribal and local government officials and foreign governments, as the Secretary deems appropriate, with respect to each application. . . . [and] solicit responses in a timely manner"); 1(f) - 1(i) (the Secretary of State shall, after considering all the information gathered and all the required consultations with officials and agencies, determine whether to issue or deny the permit unless a designated official timely disagrees, in which case the determination shall be referred to the President); 2(a) and 2(b) (amending Executive Order 11,423 to conform to Executive Order 13,337); and 3(a) and (b) (authorizing the Secretary of State to publish notices of applications for cross-border permits and to issue "such further rules and regulations, and to prescribe such further procedures . . . as may from time to time be deemed necessary or desirable for the exercise of the authority conferred by this order").

151.   Second, the 2019 Permit bypasses all federal agencies and officials, including the Secretaries of the Interior, Commerce, Defense, Energy, Homeland

Security and Transportation, the Attorney General, and the Administrator of the

Environmental Protection Agency, thereby precluding their participation in the

formulation and review of the 2019 Permit.  Executive Order 13,337, by contrast,

expressly provides for the review and participation of each of these federal

agencies and officials.  *Id.* at §§ 1(b), 1(c),1(d), 1(e), 1(f), 1(g), 1(h) and 1(i).

Contrary to Executive Order 13,337's mandate that any cross-border permits be

vetted by all of the appropriate federal agencies and officials, the 2019 Permit

makes clear its express "intent that this permit be operative as a directive *issued by

the President alone*."  2019 Permit, Article 7 (84 Fed.Reg.13103) (emphasis

added).

152.   Third, the 2019 Permit ignores and defies Executive Order 13,337's

requirement that the Secretary of State must determine whether issuance of the

cross-border permit would serve the national interest.  Executive Order 13,337

directs:  "if the Secretary of State finds that issuance of a permit to the applicant

would serve the national interest, the Secretary shall prepare a permit," but "if the

Secretary of State finds that issuance of a permit to the applicant would *not* serve

the national interest, the Secretary shall notify the officials required to be

consulted under paragraph (b)(ii) of this section of the proposed determination that

the application be *denied*."  Executive Order 13,337 §§ 1(g), 1(h) (emphasis

added).  Executive Order 13,337 emphasizes through repetition its express

mandate that "[t]he Secretary of State shall issue or deny the permit in accordance

with the proposed determination."  *Id*. § 1(i).  The only exception to the Secretary

of State's sole authority to determine whether to issue or deny the permit is if an official required to be consulted disagrees, in which case the Secretary of State "shall refer the application . . . to the President for consideration and a final decision." *Id*. § 1(i).  By contrast, the 2019 Permit makes no provision for the Secretary of State's review, let alone his consultation with other federal agencies or officials, and instead makes clear that the 2019 Permit is "issued by the President *alone*," as noted.  2019 Permit, Article 7 (84 Fed.Reg. 13103) (emphasis added).  The purpose of the 2019 Permit's excision of any action by State is clear: to prevent judicial review under the APA.  See, e.g., *Motion Systems Corp. v. Bush* ("*Motion Systems*"), 437 F.3d 1356, 1359 (Fed. Cir. 2006) ("Motion Systems . . . cannot challenge the President's actions under the APA because the President is not an 'agency.'"), citing *Franklin v. Massachusetts* (*"Franklin"*), 505 U.S. 788, 800-801 (1992).

153.   Fourth, the 2019 Permit omits consultation with state, tribal and local governmental officials as potential sources of invaluable knowledge, wisdom and perspective.  Executive Order 13,337, by contrast, provides that the Secretary of State "may also consult with such State, tribal and local government officials . . . as the Secretary deems appropriate, with respect to each application." *Id*. at § 1(e).

154.   Fifth, the 2019 Permit excises Executive Order 13,337's requirement that the applicant "obtain authorization from any other department or agency of the United States Government in compliance with applicable laws and regulations." *Id*. at § 5.  Instead, the 2019 Permit makes clear that any "reporting

obligations" of the permittee that may arise under any federal law or regulation "do not alter the intent that this permit be operative as a directive *issued by the President alone*." *Id*. at Article 7 (84 Fed.Reg. 13103) (emphasis added). This language means that the permit is "inten[ded to] be operative" irrespective of whether the permittee is required to – or does – file reports with other federal agencies under any law or regulation. The unmistakable purpose of this language is, again, to separate the permit's issuance from any action by a federal agency, and thereby shield the 2019 Permit from judicial review under the APA. As noted, the APA is only applicable to "agency" action, and not to decisions of the President acting "alone." *Motion Systems*, 437 F.3d at 1359; *Franklin*, 505 U.S. at 800-801.

155.   Sixth, the 2019 Permit gives no consideration to, let alone provide mitigation for, the environmental and cultural effects of Keystone. Executive Order 13,337, by contrast, requires the Secretary of State to consult with the Secretary of the Interior (who oversees the U.S. Fish and Wildlife Service), the Secretary of Commerce (who oversees the National Marine Fisheries Service), the Secretary of Defense (who oversees the Corps of Engineers) and the Administrator of the Environmental Protection Agency (who promulgates regulations for and administers the CWA, and has broad expertise in protection of the environment) for the purpose of "maintaining safety, public health, and environmental protections" among other objectives). *Id*. at Preamble and §§ 1(b) and 1(c).

156.   Seventh, the 2019 Permit ignores the analyses of the Project's

environmental and cultural impacts that have been or will be prepared by federal agencies under NEPA, the ESA, the CWA, the NHPA, and other environmental statutes.  Executive Order 13,337, by contrast, requires notice to and provides an opportunity for every federal agency with expertise in protecting environmental and cultural resources to apply their specialized knowledge and skill to address the potential impacts of the proposed border crossing.  *Id*. at §§ 1(b), 1(c), 1(d), 1(g) and 1(h).

157.   Because the 2019 Permit violates the foregoing material requirements of Executive Order 13,337, it is plainly *not* issued "pursuant to" that executive order.

158.   The second reason Executive Order 13,867 does not validate the 2019 Permit is that, even assuming contrary to its plain language, intent and effect that the 2019 Permit had been issued "pursuant to" Executive Order 13,337, Executive Order 13,867 cannot be given retroactive effect.  Under settled rules of statutory construction which are fully applicable to executive orders, President Trump's *subsequent* issuance on April 10, 2019, and publication in the Federal Register on April 15, 2019 (84 Fed.Reg. 15491) of Executive Order 13,867 purporting to revoke Executive Order 13,337 as of that date – April 10, 2019 – cannot be given retrospective effect to excuse the March 29, 2019 Permit's violation of Executive Order 13,337 for four reasons.

159.   First, Executive Order 13,867 is worded prospectively. All of its active verbs use the present tense and never imply any retroactive intent:  "I

- 74 -

hereby *grant* permission," "[t]his permit *supersedes* . . . . [and] *grants* the
permission . . . and *revokes* [the 2017 permit]."  84 Fed.Reg. 15491 (emphasis
added).

160.   Second, executive orders are governed by the same "rules of statutory
construction" as statutes.  *U.S. v. Angcog*, 190 F.Supp. 696, 699 (D.C. Guam
1961).  A "statute may not be applied retroactively . . . absent a clear indication
from Congress that it intended such a result."  *I.N.S. v. St. Cyr*, 533 U.S. 289, 316
(2001).  A finding of retroactive intent requires "statutory language that [is] so
clear that it could sustain only one interpretation."  *Id*. (quoting *Lindh v. Murphy*,
521 U.S. 320, 328 n. 4 (1997)).  There is no such retrospective language here.  To
the contrary, all the verbs in Executive Order 13,867 that give approvals to
TransCanada, or release TransCanada from the restraints of previous approvals,
are stated in the present tense – *e.g.*, "grants," and "revokes – as noted.

161.   Third, Executive Order 13,867 expressly saves "*all permits
heretofore issued* pursuant to the orders enumerated in section 2(k)" – *e.g.*,
Executive Order 13,337 – evincing an unmistakable intent to *preserve* the effect of
Executive Order 13,337 right up to the moment that Executive Order 13867
revoked it.  Executive Order 13,867 § 3) (emphasis added).  Therefore, Executive
Order 13,337 remained in effect until April 10, 2019, the date that President
Trump issued Executive Order 13,867.  Since Executive Order 13,337 remained in
effect until April 10, 2019, *a fortiori,* it was in effect twelve days earlier, on March
29, 2019, when President Trump issued his 2019 Permit.

162.   Fourth, the principle of separation of powers militates against an interpretation that would allow the Executive Branch to retroactively render lawful, action that was *un*lawful *when it was taken*.   Otherwise, the President could escape the consequence of any court ruling invalidating his prior unlawful action by thereafter issuing a *new* executive order declaring his prior action lawful. Judicial review of Presidential action would be effectively eviscerated, undermining the separation of powers vital to our constitutional system of governance.   *City and County of San  Francisco v. Trump*, 897 F.3d 1225, 1231-1235 (9th Cir. 2018).

163.   For each of the foregoing reasons, this Court should declare that President Trump's issuance of Executive Order 13,867 on April 10, 2019 did not save President Trump's March 29, 2019 Presidential Permit from invalidation due to that permit's fatal conflict with Executive Order 13,337, for two reasons.  First, Executive Order 13,867 by its terms does not apply to the 2019 Permit.  Second, even if it did, it could not be applied retroactively to validate the 2019 Permit.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

1.    Adjudge and declare that the Corps of Engineers violated NEPA by failing to prepare an environmental impact statement analyzing the environmental impacts of its reissuance on January 6, 2017 of a revised NWP 12 based on a deficient and erroneous FONSI, and its approval of NWP 12 must therefore be

vacated and set aside under the APA.

2.      Adjudge and declare that the Department of State's December 20, 2019 Final SEIS violates NEPA, and its approval of that document must therefore be vacated and set aside under the APA.

3.      Adjudge and declare that FWS's issuance of its December 23, 2019 concurrence letter for Keystone, and consequent failure to require formal consultation with BLM and to prepare a Biological Opinion, violated the ESA, and therefore FWS's concurrence letter must accordingly be vacated and set aside under the APA.

3.      Adjudge and declare that BLM's issuance on January 22, 2020 of its ROD approving a ROW and TUP for Keystone violated NEPA, the MLA, FLPMA, and the ESA, and that BLM's approval of that ROD must accordingly be vacated and set aside under the APA.

4.      Adjudge and declare that President Trump's issuance of Executive Order 13,867 purporting to revoke Executive Order 13,337 on April 10, 2019, does not save President Trump's March 29, 2019 Presidential Permit from invalidation due to its fatal conflict with Executive Order 13,337 for two reasons. First, Executive Order 13,867 by its terms does not apply to the 2019 Permit. Second, even if it did, it could not be applied retroactively to validate that permit.

5.      Preliminarily and permanently enjoin all Defendants, including TransCanada should it intervene, from initiating any activities in furtherance of the Project that could result in any change or alteration of the physical

- 77 -

environment unless and until Defendants comply with the requirements of NEPA, the MLA, FLPMA, the ESA, and the APA, and their implementing regulations;

6.      Award Plaintiffs their reasonable attorneys' fees and costs and expenses incurred in connection with the litigation of this action pursuant to applicable law; and

7.      Grant Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

Dated:  December 4, 2020      LAW OFFICES OF STEPHAN C. VOLKER
s/ *Stephan C. Volker*
STEPHAN C. VOLKER (Pro Hac Vice pending)


Dated:  December 4, 2020      PATTEN, PETERMAN, BEKKEDAHL &
GREEN, PLLC
s/ *James A. Patten*
JAMES A. PATTEN

Attorneys for Plaintiffs
INDIGENOUS ENVIRONMENTAL NETWORK
and NORTH COAST RIVERS ALLIANCE